715 P.2d 716

**STATE of Arizona, Appellee,**

v.

**Ben JENKINS and Frances E. Jenkins, Appellants.**

No. 6612–PR.

Supreme Court of Arizona, In Banc.

Jan. 27, 1986.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Crane McClennen Asst. Attys. Gen., Phoenix, for appellee.

John Doherty, Phoenix, for appellant Ben Jenkins.

Kanne & Bickart by Allen Bickart, Phoenix, for appellant Frances Jenkins.

CAMERON, Justice.

Defendant, Ben Jenkins, was convicted of two counts of child molestation, A.R.S. § 13–1410, and was sentenced to serve two consecutive fourteen-year prison terms. His wife, Frances Jenkins, was convicted in the same trial of one count of child abuse, A.R.S. § 13–3623 and was sentenced to three years probation. The Court of Appeals, Division One, affirmed the convictions of both Frances and Ben Jenkins. [Nos. 1 CA–CR 6592 and 1 CA–CR 6607 (consolidated), filed 9 April 1985]. Ben Jenkins petitions this court for review. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and Rule 31.19, Ariz.R.Crim.P., 17 A.R.S.

We granted the defendant's petition for review to decide whether defendant was denied effective assistance of counsel because his attorney had a conflict of interest stemming from a simultaneous representation of a prosecution witness in a divorce action.

The facts necessary to determine the issue follow. Child Protective Services received a telephone call from the Jenkins' emancipated daughter, Gwen, who stated that she believed her two youngest sisters were being sexually molested by their father, Ben Jenkins. As a result of the call, the two sisters were removed from the Jenkins' home to a foster home. In addition, Child Protective Services referred the allegations to the Phoenix Police Department, which resulted in an investigation by Detective Guisti of the Sex Crimes Division.

During his investigation, Guisti interviewed the two victims, one age 7, and the other age 5. By phone he interviewed Gwen, who said that she and her other sister, Ruby, had also been molested sexually as children. He tried to talk to Ruby. Ruby denied ever having been sexually molested and asserted that the allegations must have been fabricated by Gwen. Guisti received information from the doctors who examined the two victims. The doctors found that both girls showed signs of penetration. Lastly, Guisti interviewed Mrs. Jenkins in her home alone. Mrs. Jenkins attempted to explain the older victim's broken hymen, stating that she had caught her trying to insert a tampon. When confronted with the fact that the youngest daughter had a traumatized hymen, she responded, "[her] too?"

At the Grand Jury hearing, Detective Guisti was the only prosecution witness. As a result of the hearing, the Grand Jury issued warrants for the arrest of both Ben and Frances Jenkins.

Early in the proceeding, the trial court appointed separate counsel for Ben and Frances. On 16 August 1982, the court held a voluntariness hearing for Frances only; Ben had not made any statements to police. Detective Guisti was again the only witness. Ben's counsel, Ron Saper, was present at this hearing, but he did not cross-examine Guisti.

It was at the time of this voluntariness hearing that Ron Saper undertook to represent Detective Guisti in a divorce action. According to his testimony at the defendant's hearing on the motion to vacate, Detective Guisti approached Saper on 16 August 1982, and asked Saper if he would represent him in an uncontested divorce. Saper agreed. It is not clear whether the representation was agreed to before or after the voluntariness hearing; however, the voluntariness hearing is not tainted because it concerned only Frances' statements. Saper is certain that he and counsel for Frances Jenkins also interviewed Guisti before the divorce representation began. However, Detective Guisti testified that he believed the interview took place after the representation began.

The trial commenced on 17 August with the empaneling of the jury. On 19 August opening statements were given, and on that same date, according to Saper, Guisti went to Saper's office to fill out some

forms relating to his divorce action. Guisti testified that he did not meet with Saper on that date, and maintains that he did not meet with Saper about the divorce action until 1 September 1982.

The state's primary witnesses at trial were the two victims. In addition, the state called various medical personnel who had examined the girls. On 24 August 1982, Detective Guisti was called to testify for the prosecution. On direct examination, Guisti testified briefly that he had spoken to both victims, but did not testify as to the content of their statements. His testimony for the most part, concerned his conversation with Frances Jenkins which was cumulative of previous testimony. Saper's cross-examination of Guisti was approximately the same as Frances' attorney's cross-examination of Guisti. Guisti's entire testimony including the cross-examination by the two defense attorneys, comprised only eight pages of transcript.

On the same day that Guisti testified, pleadings in Guisti's divorce action were filed. In the motion to vacate, Saper stated that his secretary had prepared the pleadings which he then simply signed and dated. Saper also stated that he had not met with Guisti concerning the divorce action since 16 August. Guisti agreed that they did not meet as attorney and client during trial.

The defenses of both Ben and Frances were based on their good characters and thus, both defendants called many character witnesses. Ben Jenkins took the stand in his own behalf and denied the allegations. The defense of Ben Jenkins centered on the idea that Gwen had fabricated the allegations and had even injured both girls so that it would look like sexual penetration. Frances Jenkins did not testify.

■ At no time during the trial did Ben Jenkins make a knowing waiver of the conflict of interest. Saper contends that he told Jenkins sometime during trial that he was representing Guisti in a divorce action; this fact, however even if true, does not indicate a knowing waiver as required by *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct.

1019, 82 L.Ed. 1461 (1938). In addition, it is clear that the trial judge was not informed during trial of the conflict. On the other hand, the facts seem to indicate that the prosecutor, through uncertain means, was aware of the situation between Saper, Guisti, and Jenkins.

■ Preliminarily, we note that professionally Saper had a conflict of interest. *See* Rule 1.7, Arizona Rules of Professional Conduct. We do not condone his actions. We believe at a minimum that Saper should have consulted with his client and obtained a written waiver from him. In addition, he should have informed the trial judge of the conflict. It does not follow, however, that a violation of Rule 1.7 results in an automatic finding of ineffectiveness of counsel.

The Sixth Amendment to the United States Constitution, as well as the Arizona Constitution, art. 2, § 24, and Rule 6.1, Ariz.R.Crim.P., 17 A.R.S., provide a defendant the right to assistance of counsel. The right to assistance of counsel has been held to mean effective assistance. *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). The rationale behind the right to effective assistance of counsel is to ensure a fair trial.

Cases on ineffectiveness of counsel have come before the United States Supreme Court in two contexts: (1) conflict of interest due to multiple representation of co-defendants and (2) counsel incompetency. The former context was presented in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), while the latter was decided in the recent case, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In *Cuyler*, the Court stated a defendant had to establish that "an actual conflict of interest adversely affected his lawyer's performance" in order to prevail on a sixth amendment claim. 100 S.Ct. at 1719. However, the Court also provides that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Id.*

In the later case of *Strickland*, the United States Supreme Court set forth a two-

part test to determine whether counsel's incompetency denied defendant his right to effective assistance. First, defendant must show that counsel's performance was deficient, and second, that the deficient performance prejudiced the defense. 104 S.Ct. at 2064. Justice O'Connor, writing for the majority in *Strickland,* discussed *Cuyler* and the prejudice requirement. She stated that in a situation where assistance of counsel is actually or constructively denied or where the state interferes with counsel's assistance (*See U.S. v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) ), prejudice will be presumed. *Id.* at 692, 104 S.Ct. at 2067. Next, Justice O'Connor discussed conflicts of interest from multiple representation:

> In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interest. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, ... it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.

*Strickland v. Washington,* 466 U.S. at 692, 104 S.Ct. at 2067, 80 L.Ed.2d at 696. (citation omitted). The Court, however, refused to characterize the rule as a "per se" doctrine, stating:

> Even so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and "that an actual conflict of interest adversely affected his lawyer's performance."

*Id.* (citation omitted).

The court of appeals, in deciding the issue now before us, used the *Strickland*

test. [Slip op. at 7]. In reading *Strickland,* however, we believe that the United States Supreme Court has not changed the rule in *Cuyler* and does not now require proof of prejudice. The requirement of prejudice found in *Strickland* is limited to situations of counsel incompetency. Justice O'Connor's discussion of *Cuyler* is intended to be illustrative of when the court will presume prejudice, whether the presumption is full or limited, and what proof was necessary for the limited presumption found in *Cuyler.* We, therefore, believe that *Cuyler* remains controlling.

■ Although *Cuyler* controls, commentators have noted that courts have been confused about the actual test to apply and thus have had difficulty applying it. *See* Note, Conflicts of Interest in the Representation of Multiple Criminal Defendants: Clarifying *Cuyler v. Sullivan,* 70 Geo. L.J. 1527. Some courts have held that once an actual conflict is shown, ineffectiveness is also shown. *See Commonwealth v. Michel,* 381 Mass. 447, 409 N.E.2d 1293 (Mass.1980). Other courts have had difficulty distinguishing between adverse effect and prejudice; thus, once actual conflict is shown, these courts discuss whether the conflict prejudiced defendant's case. *See Brown v. State,* 247 Ga. 298, 275 S.E.2d 52 (1981). The third approach taken by courts holds that *Cuyler* requires proof of an actual conflict and then proof that the conflict had an adverse effect. *See Parker v. Parratt,* 662 F.2d 479 (8th Cir.1981). We agree that *Cuyler* rejected proof of prejudice as an element of the test, choosing adverse effect as an intermediate standard between proof of prejudice and presumed prejudice. We believe this third approach is supported by the language of *Cuyler,* and that it is more logical and workable. We hold, therefore, that defendant must show first that there was an actual conflict, and second that the conflict had an adverse effect.[1]

---

1. See *Brien v. U.S.,* 695 F.2d 10, 15 (1st Cir. 1982), where the majority combined the requirements of error and nexus in defining actual conflict. "In order to establish an actual con-

## WAS THERE AN ACTUAL CONFLICT

■ As a matter of professional ethics it is clearly a conflict of interest for defense counsel to represent a prosecution witness. Rule 1.7, Ariz.R.Prof. Conduct. The Arizona Rules of Professional Conduct define conflict of interest as when "a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests." Rule 1.7, comment. A finding that there was a conflict of interest under the Arizona Rules of Professional Conduct does not mean there is an actual conflict of interest for the purposes of determining ineffective assistance of counsel in a criminal case. An actual conflict arises from the nature of the other client represented by defense counsel. For example, where the other client is either the victim of defendant's crime or someone intimately associated with the state, it is an actual conflict for defense counsel to represent that person, even in an unrelated matter. See *Castillo v. Estelle*, 504 F.2d 1243 (5th Cir.1974) (where defense counsel simultaneously represented, in an unrelated civil case, the owner of the business from which defendant had stolen property); *Zuck v. State of Alabama*, 588 F.2d 436 (5th Cir.1979) (where the law firm which served as counsel for defendant also represented in an unrelated civil matter the prosecutor who tried Zuck). *But see Barham v. U.S.*, 724 F.2d 1529 (11th Cir.1984) (which held that it is not an actual conflict for defense counsel to represent a prosecution witness for purposes of ineffectiveness claim where prosecution witness' testimony was circumstantial and the government's case would have been made without it). In the instant case, there is a question of Saper's treatment of his divorce client's testimony in the criminal case. We hold that there was an actual conflict of interest in the instant case.

## ADVERSE EFFECT

■ Once defendant has shown an actual conflict, he must then show adverse effect. Although some courts have discussed adverse effect in prejudice terms, adverse effect and prejudice are distinctly different. The Ninth Circuit Court of Appeals in *Hearst v. U.S.*, 638 F.2d 1190 (9th Cir. 1980), brought into focus the difference between adverse effect and prejudice in its discussion on the effect of overwhelming guilt. If the standard were prejudice and there were overwhelming evidence of guilt, then defendant would face an impossible task in showing that a relatively minor error resulted in his conviction. *Id.* at 1194. When the standard is adverse effect, overwhelming evidence of guilt is irrelevant so long as that same relatively minor error, if caused by an actual conflict, had an adverse effect. Thus, to establish prejudice, a defendant would have to show that the attorney's conflict reduced his effectiveness so severely that it resulted in or contributed to defendant's conviction. Note, Conflicts of Interest in Representation of Multiple Criminal Defendants: Clarifying *Cuyler v. Sullivan*, 70 Geo.L.J. 1527, 1543 n. 100 (1982). To establish adverse effect, defendant would only have to show that his attorney's conflict reduced his effectiveness. *Id.* Hence, adverse effect is a less burdensome requirement than prejudice.

In only a few cases can it be said that counsel did an absolutely perfect job at trial. In most cases, one could find something that counsel could have done better. The fact that counsel might have performed better at trial does not rise to adverse effect. The negative impact must be substantial although it need not have caused defendant's conviction. . Whether an adverse effect has had a substantially negative impact must be determined on a case by case basis.

flict of interest, ... he must demonstrate that some plausible alternative defense strategy or tactic might have been pursued.... He need not show that the defense would necessarily have been successful if it had been used, but merely that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with the attorney's other loyalties or interests." *Id.* at 15. (citations omitted)

■ Defendant in his motion to vacate and in his petition for review mentioned two errors or adverse results stemming from the conflict of interest: Saper did not conduct a sufficient investigation of Guisti and Saper was ineffective in his cross-examination of Guisti. As to the failure to investigate, defendant contends that he asked Saper to investigate Guisti and Saper refused. Defendant stated that he asked Saper to hire a private investigator to investigate everyone who had made any allegations against defendant. When Saper asked the defendant who in particular he wanted investigated, defendant said "For one, Mr. Guisti." Saper responded "Well, I've known Mr. Guisti and I don't believe he lies." This comment by Saper occurred two to three months before Guisti retained Saper. Saper's failure to hire a private investigator could not at that time be the result of a conflict of interest.

Defendant's second contention is that Saper did not conduct an effective cross-examination of Guisti. Specifically, defendant testified at the motion to vacate that Saper did not question Guisti concerning all the areas that Jenkins and Saper had discussed in preparation for trial. This allegation is admittedly more troublesome and we must review the evidence to determine if the actual conflict of interest had an adverse effect on Saper's representation of defendant.

Saper briefly cross-examined Guisti. Saper did not give Guisti any special treatment. For example, Saper's cross-examination indicated that Guisti may have made mistakes on his departmental report. It can be alleged that Saper could have cross-examined Guisti in more detail about the statements the victims made to him; however, both girls had already given their damaging testimony and for Saper to have elicited more from Guisti would have been to emphasize and remind the jury of the girls' statements. Saper could also have questioned Guisti about the doctors statements; however, they also had already testified and further questioning would have added nothing and again might have emphasized their testimony through repeti-

tion. Most of the damaging testimony was already in evidence and cross-examination of Guisti could have done more harm than good. In reaching this conclusion, we rely on the cross-examination of Guisti by the attorney for the co-defendant. The interest of defendant and Frances was identical. Frances' attorney's cross-examination of Guisti was even more perfunctory than Saper's. This reinforces our opinion that from the facts of the case Guisti need not have been extensively cross-examined.

We do not believe that Saper's failure to question Guisti extensively was because of the conflict of interest. The conflict did not have an adverse effect on defendant's representation by Saper. We find no inadequate representation of counsel.

We have reviewed the record for fundamental error pursuant to A.R.S. § 13–4035, and we find none.

Affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and FELDMAN, JJ., concur.