**Betty Lou BEETS, Petitioner–Appellee, Cross–Appellant,**

v.

**James A. COLLINS, Director Texas Department of Criminal Justice, Institutional Division, Respondent–Appellant, Cross–Appellee.**

No. 91–4606.

United States Court of Appeals, Fifth Circuit.

March 18, 1993.

William C. Zapalac, Asst. Atty. Gen., Dan Morales, Atty. Gen., Austin, TX, for Collins.

Joe Margulies, Robert L. McGlasson, Austin, TX, for Betty Lou Beets.

Before JOLLY, HIGGINBOTHAM, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

On October 11, 1985, petitioner Betty Lou Beets (Beets) was convicted of the capital murder of her husband, Jimmy Don Beets (Jimmy Don). Beets was sentenced to death. Beets appealed unsuccessfully to the Texas Court of Criminal Appeals, *see Beets v. State,* 767 S.W.2d 711 (Tex.Crim. App.1988), and sought a writ of certiorari before the United States Supreme Court, *Beets v. Texas,* 492 U.S. 912, 109 S.Ct. 3272, 106 L.Ed.2d 579 (1989). Her request for a state writ of habeas corpus having been denied, Beets sought a writ of habeas cor-

pus in federal court. 28 U.S.C. § 2254. The district court granted the writ on May 9, 1991, because, the court found, Beets's defense counsel at trial was a material witness who should have resigned to testify rather than represent her. The State of Texas appeals this decision, and Beets cross-appeals the denial of relief on three other claims. We reverse.

## I.

## BACKGROUND

An exposition of the facts underlying Beets's conviction may be found in the opinion of the Texas Court of Criminal Appeals, *Beets v. State,* 767 S.W.2d 711 (Tex.Crim.App.1988). Beets's fifth husband, Jimmy Don, disappeared on August 6, 1983. His fishing boat was found drifting on Lake Athens, Texas, suggesting that he had drowned.[1] More than a year later, a trailer home that was Jimmy Don's separate property before his death was destroyed by fire. When the insurer refused Beets's claim for the loss, Beets sought the counsel of E. Ray Andrews, an attorney who had represented Beets since 1981 or '82. During their discussions, they also decided that Andrews would pursue any insurance or pension benefits to which Beets might be entitled.

Beets and Andrews entered into a contingent fee arrangement whereby Andrews would pursue collection on both Beets's fire insurance claim and any death benefits to which she might have been entitled in connection with Jimmy Don's disappearance. Andrews determined that certain benefits existed and so informed Beets. Andrews sought the assistance of two attorneys more experienced in collecting such benefits. Andrews then arranged a meeting in his office with Beets and Randell Roberts, one of the other attorneys. Roberts agreed to associate his firm in the matter. Roberts's brother, attorney Bruce Roberts, eventually took over responsibility for Beets's claims. Through his efforts, Jimmy Don's former employer, the City of

---

1. It was determined during trial that Beets's son, Robbie, had set the boat adrift to give the appearance that Jimmy Don had fallen overboard.

Dallas Fire Department, agreed to provide benefits to Beets.

Before Beets received the first check from the Fire Department, she was arrested on June 8, 1985, and was charged with the capital murder of Jimmy Don. Beets was charged with shooting and killing her husband and, with the assistance of her son, Robbie Branson, burying him under a planter in her front yard.[2] Beets allegedly disposed of her fourth husband, Doyle Wayne Barker, in a similar fashion. Barker's body was found buried in the back yard underneath a patio upon which a storage shed had been erected. Beets had also shot another former husband, Bill Lane, although he survived.

Andrews agreed to extend his representation of Beets to the capital murder charge. The case generated significant media interest on both a local and national level. On October 8, just after Beets's trial commenced, she signed a contract transferring all literary and media rights in her case to Andrews's son, E. Ray Andrews, Jr. The trial judge never became aware of the media rights contract during trial, although he did learn of it three months later during a hearing on Beets's motion to appoint counsel for appeal when the prosecutor asked Beets if she had signed over the book rights to her case to Andrews's son. The judge did not inquire whether Beets was willing to waive her Sixth Amendment right to conflict-free counsel.

Beets was convicted of murder for remuneration and the promise of remuneration on the theory that she killed her husband in order to obtain his insurance and pension benefits. *See* Tex.Penal Code Ann. § 19.-03(a)(3) (Vernon Supp.1991). One of Andrews' defense strategies at trial was to attack the remuneration element of the crime.[3] The Texas Court of Criminal Appeals later held that "a person commits a murder for remuneration ... where the actor kills a victim in order to receive a benefit or financial settlement paid upon the death of the victim, such as proceeds of insurance and retirement benefits as in the present case." *Beets v. State*, 767 S.W.2d at 737. In other words, the state was required to show that Beets had the specific intent to receive remuneration in the form of insurance or pension benefits upon the death of Jimmy Don.

In order to prove that Beets had the required specific intent, the state introduced the testimony of Denny Burris, a chaplain with the City of Dallas Fire Department. Burris met with Beets several times during the first few weeks after Jimmy Don was reported missing.

> Burris testified that [Beets] made inquiry of him whether she was covered by any insurance policies that [Jimmy Don] might have had with the City of Dallas, as well as inquiring whether she would be entitled to receive any pension benefits that Beets might have accumulated. [Beets] did not profess to Burris that she had any specific knowledge of either insurance coverage on [Jimmy Don]'s life or any pension benefits [Jimmy Don] might have accumulated. Burris told her that he did not know but would check into the matter and report back to her. Burris did check and learned that [Jimmy Don]'s life was insured with the total amount of insurance being approximately $110,000. He also learned that [Beets] would be entitled to receive approximately $1,200 each month from [Jimmy Don]'s pension benefits. Burris advised [Beets] of his findings, and also told her that according to the City Attorney of Dallas that because [Jimmy Don]'s body had not been recovered there would be a seven year waiting period before any payment of insurance proceeds could occur.

*Beets v. State*, 767 S.W.2d at 716–17.

Andrews's strategy to negate the specific intent element of the capital crime was to

---

**2.** The planter was also described as a "wishing-well." *Beets v. State*, 767 S.W.2d at 739.

**3.** Beets principally contended at trial that it was her son Robbie Branson who actually killed Jimmy Don after an argument. At the federal habeas hearing Andrews stated that his defense strategy was, "first of all," to prove Beets's innocence. He also testified that his "number one defense" was to show that Beets was not guilty.

introduce testimony that Beets was un- aware of any potential insurance or pension benefits available to her at the time she approached Andrews for assistance in pursuing her claim regarding the fire damage to the trailer home. Bruce Roberts's testimony was intended to bolster this position. He indicated that Beets seemed interested in no other insurance claims than that pertaining to the damaged trailer. He also testified that she never received any money on her claims.

The state habeas corpus proceedings, following affirmance of the conviction on direct review, shed an oblique light on the issues now before us more by what they do not emphasize than by what transpired there. Beets raised her conflict-of-interest claim only as to the media rights contract— and without mentioning Andrews's status as a witness—as claim number 34(h) on page 70 of her voluminous filing in the state trial court. Agreeing with the substance of Andrews's affidavit that the media rights contract did not adversely affect her representation, the trial court denied relief perfunctorily and was affirmed in this action by the Texas Court of Criminal Appeals.

Beets's federal habeas petition alleged, among many other issues, that Andrews's failure to withdraw and offer direct testimony that Beets was ignorant of potential death benefits constituted an actual conflict of interest with his client. Beets further alleged that the media rights contract gave rise to a separate conflict of interest. Beets claimed that Andrews was constitutionally ineffective because of his failure to introduce evidence at the penalty phase that Beets was afflicted with battered woman syndrome and other arguably mitigating conditions. Finally, Beets asserted

that the prosecution promised leniency to her two children in exchange for their testimony and that the prosecution never informed Beets of these agreements.

The district court, after holding an evidentiary hearing,[4] decided that Andrews's failure to withdraw and testify resulted in an actual conflict of interest that adversely affected his representation of Beets, and he granted a writ of habeas corpus on this basis. The court also found that the media rights contract, factually intertwined with the failure to withdraw conflict, constituted a separate conflict of interest, but it did not adversely affect Andrews's performance. The court denied relief on the other two claims. We address these four claims, the only ones now at issue, seriatim.

## II.

### DISCUSSION

#### A. The Right to Conflict–Free Counsel

██ Risen from virtual obscurity in her state habeas petition to the top of the issues in federal court is Beets's allegation that Andrews's failure to withdraw and testify for Beets constituted an actual conflict of interest that adversely affected the adequacy of his representation of Beets and was, therefore, a violation of the Sixth Amendment. The district court found such a conflict. The question whether the facts in a particular case give rise to a conflict of interest is a mixed question of law and fact, which we review *de novo*. See *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984); *Cuyler v. Sullivan*, 446 U.S. 335, 342, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980); *Humphrey v. Lynaugh*, 861 F.2d 875, 876 (5th Cir.1988), *cert. denied*,

**4.** It is not clear that Beets was actually entitled to an evidentiary hearing. If Beets's case arose today it is even more doubtful that she would have been so entitled under the cause-and-prejudice standard announced last year in *Keeney v. Tamayo–Reyes*, —— U.S. ——, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). Under *Keeney*, Beets would be entitled to an evidentiary hearing only if she could "show cause for [her] failure to develop the facts in state-court proceedings and actual prejudice resulting from that failure." —— U.S.

at ——, 112 S.Ct. at 1721. Moreover, Beets's failure to develop her claims in state court would be excused and a hearing mandated only if she could "show that a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing." *Id.; cf. McCleskey v. Zant*, 499 U.S. ——, ——, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991); *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649–50, 91 L.Ed.2d 397 (1986).

490 U.S. 1024, 109 S.Ct. 1755, 104 L.Ed.2d 191 (1989).

### 1. *The Cuyler Standard*

 The Sixth Amendment guarantee of counsel is intended to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution. *Strickland*, 466 U.S. at 691–92, 104 S.Ct. at 2067. In some contexts, however, prejudice is presumed. *Id.* One such circumstance is present when counsel is burdened by an actual conflict of interest. In such instances, "counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Id.* When a claim of ineffective counsel is based on an alleged conflict of interest, "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718.

### 2. *The Applicability of the Cuyler Standard*

While this panel is bound to follow certain precedents utilizing the *Cuyler* standard even when the alleged conflict does not involve multiple representation, the desirability of that approach is not a foregone conclusion. In *Illinois v. Washington,*[5] three justices dissented from the denial of certiorari in a case in which the Illinois Supreme Court held that *Cuyler*'s conflict standard was limited to cases involving multiple representation. While noting that the ruling of the Illinois Supreme Court made a distinction that many federal courts have failed to recognize, Justice White also noted that "[m]ost of these courts have simply applied *Cuyler* to non-multiple-representation situations without even consid-

ering the possibility that it did not apply." *Illinois*, 469 U.S. at 1023, 105 S.Ct. at 443. But while three members of the Court noted the question, the Court did not provide an answer.

 At present, however, *Cuyler* appears applicable to the circumstances of this case, for although *Cuyler* involved a situation of multiple representation, the Court's opinion did not purport to limit its discussion of conflicts of interest to circumstances involving multiple representation. Perhaps most conflict of interest cases involve either simultaneous representation of codefendants with conflicting interests or successive representation of codefendants and trial witnesses. When an actual conflict of interest arises under such circumstances, the attorney is torn between conflicting duties and cannot satisfy both. While the "conflicting duties" definition of a conflict of interest demonstrates the most obvious violation of the Sixth Amendment under the guise of conflict of interest, the "conflicting duties" definition does not exhaust the kinds of conflicts of interests recognized by the constitutional right to counsel. Indeed, in *Strickland*, the Supreme Court used a broader definition, stating that an actual conflict of interest exists when "counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties." 466 U.S. at 692, 104 S.Ct. at 2067.

In *Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981), for example, the Court found that the attorney labored under at least a potential conflict of interest by placing the interests of the employer, who was bankrolling the defense, over the interests of the employee-defendants. In *Wood*, the defendants were arrested and charged with distributing obscene materials in connection with their employment at an adult theater and an adult bookstore. The employer, the owner of the bookstore and theater, paid for their defense. Each of the defendants was found guilty and received a sizeable fine, presumably on the assumption that the employer would pay the fine. The employer, however, did not pay the fines, and the

---

**5.** 469 U.S. 1022, 105 S.Ct. 442, 83 L.Ed.2d 367 (1984).

defendants' probations were revoked. On appeal, the defendants raised constitutional challenges to the revocation of their probation under these circumstances, and the Supreme Court remanded the case for consideration whether an actual conflict of interest tainted the defendants' revocation hearing. *Wood* was not a case of conflicting duties, for the attorney owed no duty to the employer, only to the defendants. Nevertheless, the Court seemed to indicate that the potential conflict of interest implicated in that case should be analyzed under the *Cuyler* standard. *Wood,* 450 U.S. at 271, 101 S.Ct. at 1103. Together, *Strickland* and *Wood* suggest that the *Cuyler* analysis may not be limited to conflicts of interest involving multiple or successive representation. Consequently, it is no wonder that this court and others have recognized numerous circumstances in which an attorney has breached the duty of loyalty. *See, e.g., United States v. Greig,* 967 F.2d 1018 (5th Cir.1992), and cases cited therein.

Having recognized the potential application of *Cuyler*'s conflict analysis beyond the multiple representation scenario, we nevertheless acknowledge the force of Judge Higginbotham's argument to the contrary. *Cuyler* sets a lower threshold for a sixth amendment violation (the "adverse effect" test) where, in the case of multiple representation, one cannot know for sure what tactical decision counsel would have made absent the conflicting duties to clients. If the conflict existed only between the lawyer's self-interest and the defendant's interest, however, the only relevant standard of harm is the effect of a decision on the defendant's case; that effect can be measured by *Strickland*'s "prejudice" standard. The Supreme Court will have to sort out this quandary.

### 3. *Trial Court Inquiry Into Conflict*

■ Beets argues that she is entitled to relief "because the trial judge made no inquiry whatsoever into the nature and extent of Andrews's conflicts of interest."

She cites *Holloway v. Arkansas,* 435 U.S. 475, 484–85, 98 S.Ct. 1173, 1179, 55 L.Ed.2d 426 (1978), for the proposition that "when a conflict of interest is 'brought home to the court,' but the judge nonetheless fails to conduct an inquiry," reversal is automatic. But bringing a conflict home to a court does not, as Beets suggests, oblige a trial judge to conduct an inquiry anytime the judge becomes aware of a potential conflict of interest. The Supreme Court never intended to require a trial court to initiate an inquiry every time it becomes aware of a possible conflict of interest.[6] *Cuyler,* 446 U.S. at 346–47, 100 S.Ct. at 1717. On the contrary, the Court held in *Cuyler* that defense counsel must advise the state court "promptly when a conflict of interest [in a multiple representation case] arises during the trial." *Cuyler,* 446 U.S. at 346–47, 100 S.Ct. at 1717. This language directly precedes the sentence Beets quotes.

■ This case in no way raises the possibility that the state court should have inquired *sua sponte* whether Andrews's representation of Beets might be compromised. The trial judge first learned of the media rights contract some three months after the close of the trial on the merits at a hearing on Beets's motion for appointment of counsel on appeal. Further, it is not apparent that the trial court or the parties ever suspected during the state proceedings that Andrews might have run afoul of the ethical rules governing an attorney who is also a potential witness.

### B. The Attorney as Witness

Because there was no objection at trial, Beets must shoulder the burden of establishing an actual conflict of interest that adversely affected her lawyer's performance. *Cuyler,* 446 U.S. at 348, 100 S.Ct. at 1718; *Holloway,* 435 U.S. at 484–91, 98 S.Ct. at 1178–82.

### 1. *Actual Conflict*

■ The ethical canons of the Texas State Bar require an attorney to withdraw

---

**6.** As a supervisory matter, federal courts in this circuit are required to admonish defendants when there exists the possibility for conflicts inherent in an attorney's representation. *See*

*e.g., United States v. Garcia,* 517 F.2d 272 (5th Cir.1975); *United States v. Greig,* 967 F.2d 1018 (5th Cir.1992). This prophylactic rule does not, however, express the constitutional standard.

once the attorney learns that he, or another attorney with whom he is associated, "ought" to be called as a trial witness.[7] Whether or not Andrews' omission violated a disciplinary rule, a question we do not decide, the violation of a state ethical canon does not necessarily establish a violation of the Sixth Amendment. Careful scrutiny of the record persuades us that, contrary to the district court's conclusion, Andrews did not represent Beets while laboring under a conflict of interest.

Beets argues that Andrews would have been the only witness who could have testified favorably about her state of mind concerning the remuneration element of the capital murder charge. She repeatedly asserts that according to his affidavit submitted in the federal habeas proceeding, it was Andrews who first suggested that she might be entitled to benefits arising out of her husband's disappearance. Beets also asserts that Andrews's testimony would show that when she met with him to discuss an insurance claim on the trailer home, she had no idea what, if any, benefits she might have been entitled to receive.[8]

Beets overstates both the facts of her case and their legal significance. Andrews could not testify about Beets's state of mind at the time of the murder, nor could he testify about what Beets knew at the time of her engagement of Andrews. He could only testify about his impression that

Beets seemed genuinely ignorant of any benefits she might be entitled to. Indeed, at the federal evidentiary hearing he said that it was his conclusion from his meeting with Beets that she was ignorant about the availability of widow's benefits. Both Bruce and Randell Roberts also could have testified concerning Beets's apparent ignorance, and Bruce Roberts did so testify. Roberts testified that he first became acquainted with Beets when she was referred to him by Andrews so he could represent her in attempting to collect the fire insurance on the trailer home. He also testified that Beets's primary concern was with collecting the fire insurance benefits and that she did not put any pressure on him to collect any insurance or pension benefits. Roberts understood that his job was to "see[ ] what insurance was available, if any," and he testified at one point that Beets did not know what benefits she was entitled to, although he also testified that she brought what "looked like part of a policy" with her when she visited with him.[9]

Beets responds that Bruce Roberts's testimony lacked the impact and force of one who could testify that Beets did not learn of potential death benefits until nearly two years after Jimmy Don's death, because Roberts did not speak with Beets until after she had discussed the fire insurance claim and death benefits with *two* other attorneys, Andrews and Randell Roberts.[10]

---

7. The Texas Code of Professional Responsibility governed attorneys' conduct at the time of trial. Rule 5–102(A) provides:

 If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he *shall withdraw* from the conduct of the trial and his firm, if any, shall not continue representation in the trial....

 Supreme Court of Texas, Code of Professional Responsibility, DR 5–102(A) (1982) (emphasis added).

8. Beets offered this testimony herself at trial.

9. It is not clear whether this document, which Roberts thought came from a credit union in Dallas, was part of an actual policy or not. It appears that Roberts was never able to determine the exact nature of the item, because he

later sent a letter to the credit union asking if they had a policy on Jimmy Don.

10. The State contends that Roberts's testimony renders Andrews's potential testimony merely cumulative. The State asserts that where an attorney's testimony is not essential to the case, or would be merely cumulative of other evidence, there is no ethical duty placed upon Texas lawyers to withdraw from representation. *See* State Bar of Texas, Ethical Considerations on Code of Professional Responsibility, EC 5–10 (1972):

 It is not objectionable for a lawyer who is a potential witness to be an advocate if it is unlikely that he will be called as a witness because his testimony would be merely cumulative or if his testimony will relate only to an uncontested issue.

Moreover, argues Beets, neither Bruce nor Randell Roberts could truthfully testify that "[he] was the one to suggest that she may have been entitled to benefits arising out of her husband's disappearance." Andrews Affidavit ¶ 5.

 Even assuming Beets's factual allegations, she has failed to establish the "constitutional predicate" for her claim of ineffective assistance of counsel due to a conflicting interest. Under *Cuyler,* Beets has not established a violation of the Sixth Amendment until she demonstrates that her counsel "actively represented conflicting interests." *Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719. This requirement that a defendant show counsel's active representation of conflicting interests stems from the concern that potential conflicts of interest will be dressed up as Sixth Amendment violations. In *Cuyler,* the Court recognized that the constitutionalized concern that counsel not serve "two masters" is simply not implicated when a potential conflict of interest fails to develop into an actual conflict of interest. A theoretical or merely speculative conflict of interest will not invoke the protections of the Sixth Amendment. *See United States v. Eisen,* 974 F.2d 246, 265 (2d Cir.1992). Indeed, as a threshold matter the defendant must demonstrate that the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests. *United States v. Litchfield,* 959 F.2d 1514, 1518 (10th Cir.1992); *United States v. Acevedo,* 891 F.2d 607, 610 (7th Cir.1989); *United States v. Horton,* 845 F.2d 1414, 1419 (7th Cir.1988).

Beets's allegations set forth facts, which, if proven, indicate a potential conflict of interest. But that is as far as her allegations go. She never takes the critical step to allege and provide proof that the potential conflict of interest developed into an actual conflict of interest. Even though Beets suggests that Andrews was aware of her ignorance of benefits arising out of Jimmy Don's disappearance, she nowhere

asserts that it ever occurred to Andrews that he should, or even could, testify in her behalf. Indeed, as the district court found, it seems not to have occurred to Andrews, an experienced criminal defense lawyer,[11] that he should be a witness or that his testimony would have aided Beets. Neither in his habeas affidavit nor in the federal evidentiary hearing—the only occasions during Beets's entire prosecution when Andrews's status as a potential witness played any role whatsoever—did Andrews suggest that he would have been a more favorable witness to Beets than Roberts. Andrews's co-counsel Gil Hargrave did not so testify; Andrews was never even asked whether he thought he should have been a defense witness.

Without this awareness of his status as a potential witness, Andrews was never faced with a decision that might call into question his loyalty to Beets's cause. Likewise, without such awareness, it is impossible to say that Andrews was being called to serve two conflicting masters, Beets's interests and his own, private, pecuniary interests. Because Beets has not demonstrated that Andrews was forced to make a choice between her interests and his own, *Litchfield,* 959 F.2d at 1518, her claim that Andrews "actively represented conflicting interests" must fail. *Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719.

### 2. *Adverse Effect*

 Nor did this potential conflict adversely affect Andrews's performance. Performance has been said "to refer to any defense counsel decision which can reasonably be expected to affect the ultimate defense whether that decision be made before, during, or after trial." *United States v. Marrera,* 768 F.2d 201, 208 (7th Cir. 1985), *cert. denied,* 475 U.S. 1020, 106 S.Ct. 1209, 89 L.Ed.2d 321 (1986). "Adverse effect is not the equivalent of prejudice, the reasonable probability of a different result, as the term 'prejudice' is defined in *Strickland.* Injury sufficient to justify reversal

---

**11.** The district court's opinion describes Andrews as "well known to the court," a "compe-tent and tenacious lawyer."

is presumed from the showing of adverse effect." *United States v. Abner*, 825 F.2d 835, 843 (5th Cir.1987), quoting *Nealy v. Cabana*, 782 F.2d 1362, 1365 (5th Cir. 1986)). *See also United States v. Greig*, 967 F.2d at 1024. Although the conflict of interest need not prejudice the defense, it must be more than illusory or imagined. *Foxworth v. Wainwright*, 516 F.2d 1072, 1077 n. 7 (5th Cir.1975) ("[A] conflict of interest does not violate the right to effective assistance of counsel if it is irrelevant or merely hypothetical."). There must be some real and measurable "harm" to the lawyer's advocacy. *See Burger v. Kemp*, 483 U.S. 776, 785, 107 S.Ct. 3114, 3121, 97 L.Ed.2d 638 (1987).

To determine whether Andrews's decision not to withdraw and testify adversely affected his defense of Beets, we consider both the strength of Andrews's exculpatory testimony and the other evidence on Beets's mercenary motive, recognizing, however, that an "adverse effect" is a less onerous standard than outcome-determinative "prejudice." In his affidavit for the habeas corpus proceedings, Andrews stated that Beets

> had no idea whether she was entitled to benefits. She did not even know whether benefits existed. She did not know, for instance, whether her husband had been insured, or whether he had a pension, nor did she know whether she was the beneficiary. She did not know who, if anyone, may have been her husband's insurer or what amount he may have been insured for.

Andrews Affidavit ¶ 7. He also stated that he "was the one who mentioned the possibility that she may have been entitled to benefits." *Id.* ¶ 10. Bruce Roberts could and did offer almost all of this testimony. The only part of Andrews's proposed testimony that Bruce Roberts could not also testify about was Andrews's affidavit statement that he had been the one to suggest to Beets that she seek her missing husband's insurance and pension benefits. Beets vastly overrates the importance of this statement by Andrews, however. Because Andrews had no knowledge of Beets's activities from the time of the murder until nearly two years later when she met with him, he could not testify as to her knowledge of what benefits might be available. He, like Roberts, could only draw an inference or speculate upon her state of mind from their conversation.

Beets has focused the eye of judicial attention on this issue in the trial by her emphatic assertion that "Andrews's principal defense strategy was to attack the remuneration element of the state's case." This is incorrect.[12] The record indicates that Beets's primary defense strategy was to show that her son, and not she, killed Jimmy Don. Some forensic evidence supported this theory. In any event, other testimony adduced at trial on the issue of Beets's specific intent suggests that even if Andrews had thought about his status as a potential witness and then decided not to withdraw, the absence of his testimony did not adversely affect the Beets's defense. Denny Burris testified, contrary to Beets, that she inquired about her eligibility for Jimmy Don's insurance and pension benefits only three or four days after his disappearance. Burris, a chaplain, was an unbiased, highly credible witness. His testimony concerned events close in time to the murder and showed that Beets already knew about Jimmy Don's insurance and pension benefits. Moreover, his report to Beets that she would not be eligible for any payment for seven years provides a credible explanation why Beets waited nearly two years before attempting to recover any benefits. Indeed, Burris's testimony tends to render the testimony of either Andrews or Roberts more incriminating than helpful. Our review of the record in this case convinces us that, notwithstanding the conscientious effort of the federal district court, Andrews's failure to testify did not, and could not have, adversely affected Beets's defense.

Beets has failed to establish that Andrews's defense of her should be scrutinized as a conflict of interest. Alternatively, if we examine Andrews's trial conduct

---

**12.** *See supra* note 3.

under the less demanding *Strickland* standard, Beets must demonstrate that Andrews' seriously deficient performance prejudiced her defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. We afford great deference to trial counsel's performance, "indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. Andrews's representation of Beets was not deficient; neither was it prejudicial to Beets's case.

### C. Media Rights Conflict

 The contract granting E. Ray Andrews, Jr., full literary and motion picture rights to Beets's story represented full satisfaction of the fee arrangement between Beets and Andrews. The district court found that Andrews's action in securing the media rights created another actual conflict of interest.

Courts, scholars, and the bar have not hesitated to denounce these types of fee arrangements.[13] Virtually every court to consider a conflict of interest arising from a media rights contract executed in favor of trial counsel has unequivocally condemned the practice.[14] The rule of the Texas Code of Professional Responsibility that governed Andrews's conduct at the time of trial stated:

Prior to the conclusion of all aspects of the matter giving rise to his employment, a lawyer shall not enter into any arrangement or understanding with a client by which he acquires any interest in publication rights with respect to the subject matter of his employment or proposed employment.

Supreme Court of Texas, Code of Professional Responsibility, DR 5–104(B) (1982). Particularly in a capital murder case, it is odious to think that counsel hopes to gain his fee by marketing the tragedy and misery of his client, her family and, worst, the victim and his loved ones.

Notwithstanding Andrews's apparent breach of his ethical obligations, this court sits not to discipline counsel, but to determine whether Andrews's ethical breach violated Beets's Sixth Amendment rights. The state has the duty to punish an attorney for unethical behavior. (Why the State Bar of Texas did not discipline Andrews is not revealed in the record.) This court will not succumb to Beets's invitation to punish her attorney by granting relief to his client.

The media rights contract posed a serious potential conflict of interest, but Beets failed to show how it ripened into an actual conflict of interest. The media rights contract was almost surely unethical, but on the facts before us, it did not by itself create an actual conflict or adversely affect Andrews's performance.

### D. Ineffective Assistance of Counsel

Beets argues that Andrews was ineffective at the sentencing phase of the trial because he did not conduct a thorough investigation of her medical, mental, and psychological history. Such an investigation, she asserts, would have produced signifi-

---

**13.** *See United States v. Hearst,* 638 F.2d 1190 (9th Cir.1980) *cert. denied,* 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981); Mark R. McDonald, *Literary–Rights Fee Arrangements in California: Letting the Rabbit Guard the Carrot Patch of Sixth Amendment Protection and Attorney Ethics?,* 24 Loy.L.A.L.Rev. 365 (1991); American Bar Ass'n Standards for Criminal Justice, Standard 4–3.4 (2d ed. 1980); American Bar Ass'n, Model Code of Professional Responsibility, DR 5–104(B); American Bar Ass'n, Model Rules of Professional Conduct, Rule 1.8(d).

**14.** *See United States v. Marrera,* 768 F.2d 201, 206 (7th Cir.1985), *cert. denied,* 475 U.S. 1020, 106 S.Ct. 1209, 89 L.Ed.2d 321 (1986); *United States v. Hearst,* 638 F.2d at 1193; *Wojtowicz v. United States,* 550 F.2d 786, 793 (2d Cir.), *cert.*

*denied,* 431 U.S. 972, 97 S.Ct. 2938, 53 L.Ed.2d 1071 (1977); *Ray v. Rose,* 535 F.2d 966, 974 (6th Cir.), *cert. denied,* 429 U.S. 1026, 97 S.Ct. 648, 50 L.Ed.2d 629 (1976); *Ray v. Rose,* 491 F.2d 285, 289 (6th Cir.), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2650, 41 L.Ed.2d 240 (1974); *People v. Bonin,* 47 Cal.3d 808, 835, 254 Cal.Rptr. 298, 313–14, 765 P.2d 460, 475 (1989), *cert. denied,* 494 U.S. 1039, 110 S.Ct. 1506, 108 L.Ed.2d 641 (1990); *People v. Gacy,* 125 Ill.2d 117, 134, 125 Ill.Dec. 770, 777, 530 N.E.2d 1340, 1347 (1988), *cert. denied,* 490 U.S. 1085, 109 S.Ct. 2111, 104 L.Ed.2d 671 (1989); *Stafford v. State,* 669 P.2d 285, 296–97 (Okla.Crim.App.) *cert. granted and judgment vacated,* 467 U.S. 1212, 104 S.Ct. 2652, 81 L.Ed.2d 359 (1984); *People v. Corona,* 80 Cal.App.3d 684, 720, 145 Cal.Rptr. 894 (1978).

cant mitigating evidence, perhaps resulting in a sentence less than death. Beets presented the district court with evidence that she was raised in abject poverty, experienced a debilitating hearing loss, was afflicted with learning disabilities, had received head injuries as a child, and suffers from battered woman syndrome.

The district court did not resolve whether Andrews's failure to investigate or present mitigating evidence at the penalty phase was deficient under the first prong of the *Strickland* test, because it found that no prejudice resulted from Andrews's failure to investigate. Both the performance and prejudice prongs of a claim of ineffective assistance of counsel are mixed questions of law and fact. We review such issues *de novo*. *Id.* at 698, 104 S.Ct. at 2070.

Andrews's representation was not deficient. During the punishment phase of the trial, Andrews argued that the jury had made a mistake in convicting Beets and pleaded with the jury to reconcile any lingering doubt in the jurors' minds by returning a life sentence rather than the death penalty. The Constitution requires counsel to investigate potentially mitigating theories only when a reasonably competent attorney would have investigated them. Andrews knew Beets personally and had represented her on a number of matters previously. At no time during their acquaintance or while Andrews represented Beets on the capital murder charge did she give Andrews any hint that she had been abused by previous husbands or boyfriends. Neither Beets nor any other member of her family ever conveyed to Andrews any information giving him reason to believe that she had a history of being physically abused. Indeed, Beets told Andrews that Jimmy Don was the best thing that had ever happened to her and that she loved him very much. Beets also testified to this effect at trial. In short, Andrews's decision not to investigate or present evidence on Beets's mental, physical, or emotional background was in no way more unreasonable than the same decision made by counsel in *Strickland*. Further, An-

drews's failure to present evidence on Beets's mental, physical, and emotional background was not prejudicial. A jury that had already determined that Beets murdered her husband in a calculated effort to profit from his death would not have been sympathetic to the impression fostered by "mitigating" evidence that Beets could not control herself. Beets has not met the burden of demonstrating a reasonable probability that, had her mitigating evidence been presented, she would not have received a sentence of death.

## E. Promises of Leniency

Beets asserts that the prosecution failed to inform Andrews of agreements reached with two of her children who testified against her at trial. Her son, Robert Branson, admitted that he helped his mother dispose of the body of Jimmy Don, and her daughter, Shirley Stegner, admitted complicity in the killing of Mr. Barker, husband number four. The only evidence Beets presents of the claimed promises of leniency is that several years' later no charges have been pursued against these two. After hearing considerable testimony on the issue, the district court found that no such promises were made. This finding is not clearly erroneous. Nevertheless, Andrews at the capital murder trial attempted to impeach the testimony of each of these witnesses by cross-examining them about any arrangements or deals reached with the prosecution. Even though Andrews later conceded that he did not believe any leniency agreements existed, he argued the existence of possible agreements during his closing summation. Therefore, Beets had the benefit of the credibility attack even without any evidence of promises of leniency.

## III.

## CONCLUSION

Andrews did not labor under an actual conflict of interest by continuing as Beets's advocate and failing to withdraw and offer testimony, nor did Andrews's actions adversely affect the adequacy of his perfor-

mance. With respect to Beets's ineffectiveness of counsel claim, Andrews's performance at trial was neither deficient, nor did he prejudice Beets by failing to present mitigating evidence of battered woman syndrome. Finally, Beets has not shown that the prosecution entered into hidden promises of leniency with her children. For these reasons, the judgment of the district court granting the writ of habeas corpus is REVERSED.

PATRICK E. HIGGINBOTHAM, Circuit Judge, specially concurring:

I join in the judgment upholding Beets's conviction and sentence and in the opinion that an actual conflict has not been shown. I do not agree with the opinion's alternative cast that the conviction and sentence could stand under the adverse effect test of *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), if it were applicable. I also argue that in an appropriate case the adverse effects tests should be confined to conflict engendered by conflicting interests of multiple clients.

I

This court has failed to articulate a satisfactory definition of adverse effect. Operating in this void, and aware that *Cuyler* did not require a showing of prejudice, the district judge fashioned this rule: "an adverse effect on performance is demonstrated when counsel, laboring under an actual conflict of interest, pursues some course of conduct inconsistent with the best interests of his client." This statement captures the elusive lesser standard.

Sister circuits have lenient standards for adverse effect. In the First Circuit, a defendant must show that his counsel did not undertake a "plausible alternative defense strategy or tactic" due to counsel's other interests. *United States v. Rodriguez Rodriguez,* 929 F.2d 747, 751 (1st Cir.1991). Similarly, the Tenth Circuit requires a defendant to show that "a seemingly valid or genuine alternative strategy or tactic" was available, "but it was inherently in conflict with [counsel's] duties to others or to his own personal interests." *Church v. Sulli-*

*van,* 942 F.2d 1501, 1512 (10th Cir.1991). The Ninth Circuit has suggested that the defendant need only show that some effect on counsel's handling of particular aspects of the trial was "likely." *United States v. Miskinis,* 966 F.2d 1263, 1268 (9th Cir.1992) (quoting *Mannhalt v. Reed,* 847 F.2d 576, 583 (9th Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988)).

We should reconsider whether the *Cuyler* standard, developed by the Supreme Court in a multiple representation case, should be applied in cases, like this one, in which the lawyer did not face the conflicting demands of more than one client.

II

The decision of E. Ray Andrews, Beets's trial counsel, not to testify had an adverse effect on her defense. Andrews had significant testimony to offer regarding the critical issue of whether the killing of Jimmy Don Beets was for a remunerative purpose. Specifically, Andrews could challenge the state's contention that Beets killed her husband for insurance and other benefits payable on his death. If the jury reasonably doubted that Beets killed her husband for the insurance money, the murder was not a capital offense.

By the test of *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), Beets did not have the burden of showing actual prejudice, meaning that the result of the trial probably would have been different. *United States v. Greig,* 967 F.2d 1018, 1024 (5th Cir.1992). To warrant relief she had to demonstrate an adverse effect upon her representation. In its alternative holding of no adverse effect, the majority effectively places on Beets the burden of showing actual prejudice.

*Cuyler*'s adverse effect element establishes a relatively low threshold for a petitioner to cross. "Once it has been established that an actual conflict exists, prejudice to the defendant must be presumed, in all but the most extraordinary circumstances the error cannot be considered harmless." *Mitchell v. Maggio,* 679 F.2d 77, 79 (5th Cir.), *cert. denied,* 459 U.S. 912,

103 S.Ct. 222, 74 L.Ed.2d 176 (1982). This limited presumption of prejudice arises from a showing of adverse effect "because, as the Court said in *Strickland,* 'it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests.'" *Nealy v. Cabana,* 782 F.2d 1362, 1365 (5th Cir.) (quoting *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984)), *cert. denied,* 479 U.S. 819, 107 S.Ct. 83, 93 L.Ed.2d 37 (1986). The panel in *Nealy* found proof of adverse effect in a multiple representation case, because defense counsel worried that if A testified at B's trial it would harm A's trial. The state responded that even if counsel did not represent both, he might not have called A due to fear of A incriminating B. The panel rejected this argument, stating that "a showing of adverse effect does not involve a 'but for' test." *Id.* Once an actual conflict has been established, the Supreme Court sought to avoid questioning its effect on a case, which requires courts "'to indulge in nice calculations as to the amount of prejudice' attributable to the conflict." *Cuyler,* 446 U.S. at 349, 100 S.Ct. at 1719 (quoting *Glasser v. United States,* 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942)).

All agree that a showing of adverse effect requires less than a showing of prejudice under *Strickland.* For that reason some courts have insisted that evidence of guilt adduced by the state should play no part in determining whether an adverse effect on performance occurred. *See United States v. Hearst,* 638 F.2d 1190, 1194 (9th Cir.1980) (stating that overwhelming evidence of guilt would be irrelevant to an adverse effect inquiry), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981); *accord State v. Jenkins,* 148 Ariz. 463, 715 P.2d 716, 720 (1986). Yet the majority invokes the testimony of Denny Burris to establish that "the absence of [Andrews's] testimony did not adversely affect" Beets's defense. Burris, a disinterested witness, stated that Beets inquired

about Jimmy Don's insurance soon after the murder. The suggestion is that because Beets discussed insurance with Burris, a chaplain, the biased testimony of Andrews was unlikely to have swayed the jury and its absence was unimportant. Burris was a chaplain, but his assignment was to discuss with Betty Beets benefits due the widow of a fireman; it was not a mission to console a widow with prayer where the widow's interest was insurance not intercession. So the evidence of Beets's early focus on insurance, as the state would have it, is not so compelling, accepting the truth of every word of Burris's testimony. Nonetheless, I agree that Andrews's testimony would not, in all likelihood, have changed the jury's verdict. To say that, however, is to dispel prejudice under *Strickland* but not necessarily an adverse effect under *Cuyler.*

The record discounts the contention that Beets's trial defense relied solely or even predominantly on showing that her son killed Jimmy Don. Throughout the trial Beets attacked the remuneration element of the state's case on which her capital murder conviction rests. Andrews's testimony could have significantly bolstered that defense. In addition to Beets's own testimony, Bruce Roberts testified that more than a year after Jimmy Don's murder Beets seemed ignorant of his insurance and benefits. Andrews, however, could have told the jury that he mentioned to Beets the possibility of receiving benefits shortly after Jimmy Don's disappearance. Any later interest or inquiry into benefits could have been attributable to this postmurder information. Moreover, Andrews could have established Beets's lack of knowledge at a time closer to the murder than Roberts' evidence. Andrews's testimony was not merely cumulative. I cannot conclude that it would not have been helpful to Beets at trial.[15] It certainly would have been in Beets's best interest for Andrews to have testified. Given the low threshold established by *Cuyler,* I would

---

**15.** The majority's suggestion that Andrews might not have testified had there been no conflict carries no weight. We rejected such an argument when made by the state in *Nealy v.*

*Cabana,* 782 F.2d 1362, 1365 (5th Cir.), *cert. denied,* 479 U.S. 819, 107 S.Ct. 83, 93 L.Ed.2d 37 (1986).

not reject Judge Parker's conclusion that Andrews's failure to give this evidence at trial adversely affected the conduct of her defense.

## III

I question the wisdom of applying *Cuyler* to a conflict of interest not created by the competing interests of multiple clients. "Numerous federal courts have failed to discern in *Cuyler* any limitation to cases involving multiple representation of defendants. Most of these courts have simply applied *Cuyler* to non-multiple-representation situations without even considering the possibility that it did not apply." *Illinois v. Washington*, 469 U.S. 1022, 1023, 105 S.Ct. 442, 443, 83 L.Ed.2d 367 (1984) (White, J., dissenting from denial of certiorari) (citations omitted). This panel must follow such precedents applying *Cuyler* to alleged conflicts between defendants and their counsels' personal interests. *See, e.g., United States v. Greig*, 967 F.2d 1018 (5th Cir.1992) (applying *Cuyler* to conflict created when trial counsel was accused of improper contact with a witness); *Ware v. King*, 694 F.2d 89, 92 (5th Cir.1982) (applying *Cuyler* to alleged conflict arising because counsel had disputes with prosecutor unrelated to petitioner's trial), *cert. denied*, 461 U.S. 930, 103 S.Ct. 2092, 77 L.Ed.2d 302 (1983). In my view, however, these facts present a situation better judged by *Strickland v. Washington* than by *Cuyler v. Sullivan.*

Typical conflict of interest cases involve either simultaneous representation of codefendants with conflicting interests or successive representation of codefendants and trial witnesses. *See Mitchell v. Maggio*, 679 F.2d 77, 79 n. 4 (5th Cir.), *cert. denied*, 459 U.S. 912, 103 S.Ct. 222, 74 L.Ed.2d 176 (1982); *United States v. Shepard*, 675 F.2d 977, 979 (8th Cir.1982). The *Cuyler* test was created in that context and best suited

to it. The Court may not have contemplated that the test would be applied to other types of conflicts.[16] Notably, in 1984 three justices sought to grant a writ of certiorari in order to address the question of whether the *Cuyler* standard should be limited to multiple representation cases. *See Illinois v. Washington*, 469 U.S. at 1022, 105 S.Ct. at 442 (White, J., dissenting, joined by Burger, C.J. and Rehnquist, J., dissenting from denial of certiorari).

The actual conflict plus adverse effect test of *Cuyler* should not be applicable to Beets's case because these facts did not present Andrews with a choice of intolerable alternatives. In a multiple representation conflict, counsel represents two clients with competing interests and is torn between two duties. Counsel can properly turn in no direction. He must fail one or do nothing and fail both. The defendant in a real sense did not have the lawyer secured to him by the sixth amendment. On the other hand, there is little meaningful distinction between a lawyer who inadvertently fails to act and one who for selfish reasons decides not to act. Lawyers who have a choice but fail to choose correctly are of a different genre from lawyers who have no choice. In one case the defendant has a lawyer albeit one who does not act in the defendant's best interest. In the other the defendant has no lawyer. As Justice Powell put it in *Cuyler*, "The conflict itself demonstrated a denial of the 'right to have the effective assistance of counsel.'" 446 U.S. at 349, 100 S.Ct. at 1719 (quoting *Glasser*, 315 U.S. at 76, 62 S.Ct. at 467). It was for that reason that prejudice is presumed under *Cuyler*. The conflict between Andrews's self-interest and Beets's best interest, however, belongs to the other genre. Andrews did not face conflicting duties in the eye of the law. Rather than being immobilized by conflicting ethical duties, Andrews was obligated to advance the best interest of his client despite his

---

**16.** Consider Justice Marshall's separate opinion in *Cuyler*. Arguing that a defendant need only show an actual conflict and nothing more, he added a footnote regarding the definition of

"conflict of interests." Only multiple representation problems are mentioned by the authorities discussed. *Cuyler*, 446 U.S. at 356 n. 3, 100

own interests or desires.[17] Andrews's failure to do so, resulting in his failure to call an important witness—himself—should be treated as a matter of professional effectiveness under *Strickland*, not as a conflict of interest under *Cuyler*.

The same conclusion is arguably reached by a finding of no actual conflict in non-multiple representation cases. The clearer route, in my view, realizes that *Cuyler* should not be implicated.

S.Ct. at 1722 n. 3 (Marshall, J., concurring in part and dissenting in part).

17. *See* Texas Code of Professional Responsibility DR 5–102(A) (1982) (requiring counsel who should be a witness to withdraw from representation). The Code also provided: "In the exercise of his professional judgment on those decisions which are for his determination in the handling of a legal matter, a lawyer should always act in a manner consistent with the best interests of his client." *Id.* EC 7–9 (footnotes omitted).