SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-07-0164-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR1999-016742-001 DT |
| JULIUS JARREAU MOORE, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Norman D. Hall, Judge (Deceased)

**CONVICTIONS OTHER THAN FIRST-DEGREE PREMEDITATED MURDER
AFFIRMED; FIRST-DEGREE PREMEDITATED MURDER CONVICTIONS AFFIRMED
IN PART, REVERSED IN PART; SENTENCES AFFIRMED**

_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
    By   Kent E. Cattani, Chief Counsel
         Criminal Appeals/Capital Litigation Section
         Lacey Stover Gard, Assistant Attorney General    Tucson
Attorneys for State of Arizona

DAVID GOLDBERG, ATTORNEY AT LAW                    Fort Collins, CO
    By   David Goldberg
Attorney for Julius Jarreau Moore

_____

**B A L E S**, Justice

¶1      This mandatory appeal is from a jury's determination that Julius Jarreau Moore should be sentenced to death for two of the three murders for which he was convicted.  We have jurisdiction under Article 6, Section 5(3), of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 13-4031 (2001).

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2 In November 1999, Delia Ramos and Sergio Mata were selling crack cocaine from a small rental house in which they lived on East Yale Street in Phoenix.[1] Delia's brother Guadalupe Ramos lived with the couple.

¶3 On November 15, Debra Ford came to the house around 5:30 p.m., bought $30 to $40 of crack cocaine, and began smoking it. After Ford ran out of money and drugs, she remained at the house hoping Delia would give her more crack. Later that evening, Ford sat outside the house smoking crack with Moore and Sarry Ortiz. At some point, Moore left and Ford went with Ortiz to drive around and smoke more crack. Ford again smoked crack when she later returned to the Yale Street house.

¶4 While Ford was away with Ortiz, Moore went to his mother's house, where he lived with his girlfriend, Jessica Borghetti. Moore told Borghetti that he had seen a person who had tried to run him over and he was not going to stand for it. He took a 9 mm pistol and drew a map for Borghetti of where he was going in case something happened to him. The map showed a destination other than the Yale Street house.

¶5 Tony Brown, an acquaintance of Ford, stopped by the

---

[1] Except in our independent review of the death sentence, A.R.S. § 13-755(A) (Supp. 2008), we view the facts in the light most favorable to sustaining the jury's verdict. *See State v. Garza*, 216 Ariz. 56, 61 n.1, 163 P.3d 1006, 1011 n.1 (2007).

Yale Street house at about 4:00 a.m. on November 16, looking for his girlfriend. Brown saw Mata outside and offered him cash if he would tell Brown's girlfriend to come out. When Mata tried to take the cash, Brown hit Mata and threatened him. Mata ran inside and Brown decided to leave.

¶6 As he was leaving, Brown saw a man, whom he later identified as Moore, hiding in oleander bushes near the house. Brown had seen Moore earlier that evening at a different crack house. Brown testified that Moore called him over to the bushes, flashed a gun, and asked if Brown wanted to help Moore "get" Mata. Brown declined and left on his bicycle.

¶7 After Brown left, Moore sat outside the Yale Street house smoking cigarettes with Ford and Guadalupe. Moore went inside, obtained a small amount of crack, and then came back outside to smoke it. Guadalupe and Ford went back inside the house. While inside, Ford could hear Moore repeatedly knocking on the door and calling for her. Delia gave Ford some crack and asked her to leave.

¶8 When Ford went outside, Moore asked if she got more crack and offered to let her use his pipe. Mata then came outside. Moore asked whether Mata had a problem with him. Ford heard no response; instead, she saw Moore shoot Mata and then turn and shoot her. Ford fell to the ground and heard several more gunshots in quick succession.

3

¶9        Shortly afterward, Ortiz picked up Moore near the Yale Street house and drove him to his mother's house.  When he went inside, his mother began yelling at him.  Moore told Borghetti he did not "need that right now" because he had just shot four people.  Upon learning that Moore had been out all night, his mother kicked him and Borghetti out of the house.  Moore and Borghetti left with Ortiz.  Moore gave Ortiz some crack while they drove around.

¶10       While driving, Ortiz saw Ford lying in the front yard of the Yale Street house.  Ortiz got out of her car and flagged down a taxi driver who called 911.  Ortiz noticed Moore trying to "take off in [her] car."  She got back in her car and they drove around the neighborhood, picked up Ortiz's friend, stopped at another crack house to smoke crack, and then drove past the crime scene again.  After seeing the police had arrived, Ortiz took Moore and Borghetti back to his mother's house.  As he got out of the car, Moore gave Ortiz and her friend some crack.

¶11       Moore and Borghetti packed some belongings, including Moore's gun and the clothes he had worn the previous night, and went to some friends' apartment.  After his photo appeared in the newspaper, Moore cut off his braids in an effort to alter his appearance.  On November 23, 1999, Phoenix police officers arrested Moore and Borghetti at the apartment.  A firearms examiner later concluded that bullets found at the crime scene

4

had been fired from Moore's gun.

¶12      Moore was indicted for and convicted of two counts of premeditated and felony murder for the murders of Delia and Guadalupe, one count of premeditated murder for the murder of Mata, one count of attempted first-degree murder for the injuries to Ford, and one count of first-degree burglary.  The trial court was to sentence Moore in August 2002, but the hearing was vacated after the Supreme Court held that Arizona's capital sentencing scheme was unconstitutional.  *See Arizona v. Ring* (*Ring II*), 536 U.S. 584, 609 (2002).

¶13      In November 2004, the trial court empanelled a jury to determine Moore's sentence.  The State alleged two aggravators: that Moore murdered Delia in an especially cruel manner, *see* A.R.S. § 13-703(F)(6) (Supp. 1999), and that Moore murdered multiple persons on the same occasion, *see id.* § 13-703(F)(8).  The jury did not reach a verdict on the (F)(6) aggravator, but did find the (F)(8) aggravator.  Before the penalty phase concluded, the court declared a mistrial because Moore's medical expert suffered a heart attack.

¶14      In May 2007, the trial court empanelled a second jury to determine Moore's sentence.  The court allowed the State to retry the (F)(6) aggravator, and the second jury also failed to reach a verdict on this aggravator.  The court instructed the jury that the (F)(8) aggravator had been established.  The jury

5

determined that Moore should be sentenced to death for the murders of Delia and Guadalupe, but should serve life imprisonment for the murder of Mata.

**DISCUSSION**

## A. Suggestive Identification

### 1. Pretrial Identification Procedures

¶15 Moore challenges the trial court's denial of his motions to suppress Ford's pretrial and in-court identifications. He argues that the court correctly concluded that the pretrial identification procedures were unduly suggestive, but erroneously found that Ford's identification of Moore was nonetheless reliable and therefore admissible under *Neil v. Biggers*, 409 U.S. 188, 199-201 (1972).

¶16 Even if a pretrial identification procedure was impermissibly suggestive, a subsequent identification is admissible if it is nonetheless reliable. *See State v. Lehr*, 201 Ariz. 509, 520 ¶ 46, 38 P.3d 1172, 1183 (2002). To determine reliability, Arizona courts consider the *Biggers* factors. *Id.* at 521 ¶ 48, 38 P.3d at 1184.

> [T]he factors to be considered [in evaluating the likelihood of misidentification] include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

6

*Id.* (alterations in original) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

**¶17**      This Court reviews trial court rulings on pretrial identifications for abuse of discretion. *Id.* at 520 ¶ 46, 38 P.3d at 1183. We defer to a trial court's factual findings that are supported by the record and are not clearly erroneous. *See State v. Grell*, 212 Ariz. 516, 528 ¶ 58, 135 P.3d 696, 708 (2006). The ultimate question of the constitutionality of a pretrial identification is, however, a mixed question of law and fact. *Sumner v. Mata*, 455 U.S. 591, 597 & n.10 (1982) (discussing difference between factual findings on particular *Biggers* factors and ultimate conclusion whether facts state a constitutional violation). This Court reviews de novo such mixed questions of law and fact. *See State v. Altieri*, 191 Ariz. 1, 2 ¶ 7, 951 P.2d 866, 867 (1997) (applying de novo review to ultimate legal determination of whether facts supported investigatory stop). A trial court ruling on a motion to suppress is reviewed based solely on the evidence presented at the suppression hearing. *State v. Newell*, 212 Ariz. 389, 396 ¶ 22, 132 P.3d 833, 840 (2006); *State v. Dessureault*, 104 Ariz. 380, 384, 453 P.2d 951, 955 (1969) (outlining procedures for hearing).

**¶18**      On the morning of the shooting, Detective Tim Cooning questioned Ford at the hospital. Ford described her assailant

as "Jay," a "black male, approximately twenty-one years of age." She also said that she had not seen Jay before the shooting. In the days that followed, Cooning showed Ford a photo of another suspect – Tony Brown. Ford indicated that Brown was not the shooter and that the shooter was "smaller in size and thinner than [Brown]."

¶19    On November 20, 1999, four days after the shootings, Cooning questioned Ford again at the hospital. Lying in a hospital bed, Ford could not easily speak because she had a tracheotomy and tubes in her nose. Cooning showed Ford a photo lineup of six African-American males that included Moore. Asked if she recognized anyone, Ford shook her head no. Cooning then asked Ford if she had any doubt that it was "Jay" who shot her and she again shook her head no. She nodded in assent when asked to confirm that she had previously said that Jay acted alone, that he was smaller and skinnier than Brown, and that he was a black male, approximately twenty-one years of age, who wore braids. Cooning also showed Ford two composite sketches, which she indicated looked a bit like the shooter.

¶20    Ford was deposed on videotape on April 28, 2000. Although Ford was in a wheelchair and paralyzed from the neck down, she was able to speak and appeared alert. At the deposition Ford testified that Jay, the man who shot her, had medium-size braids and was wearing a stocking cap and hooded

8

shirt. Ford also testified that she had met Jay three years earlier while using crack and hanging out near 23rd Avenue and Indian School and that she had not seen him again until the night before the shootings. She stated that her shooter was eighteen years old and about 6'1". The prosecutor showed Ford a video lineup comprised of short video clips of seven African-American men, including Moore. Ford was again unable to identify Moore.

¶21 On cross-examination defense counsel asked Ford to confirm that she had previously been shown pictures to see if she could identify the shooter. Ford said that while she was in the hospital an unidentified policeman had shown her a picture of the person who shot her. On redirect, the prosecutor showed Ford the video of the November 20, 1999 interview in which Cooning showed her the six-person photo lineup and the two composite sketches. The prosecutor then asked if the composite in the video looked like someone she knew. Ford instead focused on the photo lineup and said: "That looked like — one of them — it's two of them in the middle, right? Looked more like him — more like him than the picture I just seen just now." The prosecutor then showed her the original photo lineup and she immediately identified Moore as the shooter.

¶22 Before trial, Moore moved to suppress Ford's out-of-court identification and any prospective in-court

9

identification. Moore argued that the identification was unduly suggestive because Moore was the only common subject in the six-person photo lineup and the seven-person video lineup and Ford had identified him only upon the fourth showing of a lineup that included his picture. After conducting a *Dessureault* hearing, the court found that the State had failed to establish that the deposition identification procedures were not unduly suggestive, but the State had established that Ford's "in-court identification could be reliable, independent of and untainted by the April 28, 2000 identification."

¶23    Because the State does not challenge on appeal the trial court's conclusion that the identification procedures at the April deposition were unduly suggestive, we must apply the *Biggers* factors to determine whether the trial court erred in concluding that Ford's identification was nevertheless reliable. *See Lehr*, 201 Ariz. at 521 ¶ 48, 38 P.3d at 1183-84.

> a. *Opportunity to view the criminal at the time of the crime*

¶24    The trial court found, with support in the record, that Ford had an adequate opportunity to view Moore. Although the shootings occurred in the darkness of early morning, and Ford had been consuming crack throughout the night, Ford testified that thirty seconds before Mata came outside she talked with Moore from a distance of six to seven feet. She

10

also had spent time with Moore earlier that evening when they had smoked crack together, and she had heard him calling for her several times during a fifteen minute period before she went outside.

### b. Witness's degree of attention

¶25    Although the trial court did not make an explicit finding on this factor, the record shows that Ford's attention was directed to Moore when the shootings began.  She went outside in response to his persistent calling for her, and when she emerged they talked about whether she had more crack.  Within seconds Mata came outside and the encounter between the two men occurred.

### c. Accuracy of the witness's prior description of the criminal

¶26    Under *Biggers*, we assess the accuracy of a witness's *prior* description, i.e., before the unduly suggestive procedure. *See* 409 U.S. at 199-200.  Moore did not argue below, and we do not find, that the initial showing of the six-person photo lineup to Ford in November 1999 was unduly suggestive.  In that interview, Ford confirmed an earlier description of her assailant as a black male, twenty-one years old, named Jay, who wore braids, and who was smaller and thinner than Tony Brown. The record supports the trial court's finding that Ford's prior description of the shooter coincided with Moore's appearance.

11

*d. Level of certainty demonstrated by the witness at the confrontation*

¶27      Although the prosecution did not ask Ford about her level of certainty in identifying Moore, the video deposition reflects that she was certain that the person she identified in the photo lineup shot her. Before seeing the photo lineup again, she testified, "I know who shot me." After watching the video of her November 1999 interview, she said that one of photos "looked more like him" than the composite sketches. When she was then shown the actual photo lineup, she immediately identified Moore.

*e. Length of time between the crime and the confrontation*

¶28      The deposition took place nearly six months after Ford witnessed the shooting. This passage of time does not in itself defeat the reliability of the identification. *See, e.g., id.* at 201 (finding identification made seven months after crime reliable); *Lehr*, 201 Ariz. at 521 ¶ 51, 38 P.3d at 1184 (stating passage of four months gives pause but ultimately does not threaten reliability).

*f. Weighing of factors and conclusion*

¶29      Whether a pretrial identification is reliable is based on the "totality of the circumstances." *Biggers,* 409 U.S. at 199. We find that the State established a reliable basis for Ford's identification independent of any suggestive procedures

12

used at the April 2000 deposition.  Ford's use of crack cocaine, her failure to identify Moore in her November 1999 interview, and any inconsistencies in her account affect the weight, rather than the admissibility, of her identification and were appropriately the subject of cross-examination.  The trial court did not err in admitting Ford's pretrial and in-court identifications.

### 2.   The Prosecution's Opening Statement Comment

¶30    During opening statements, the prosecutor told the jury, "Debra . . . knew Julius Moore, Jay.  She described him. She recognized him from the night of the shooting from seeing him before, and she recognized him sometime later as well." Toward the end of his remarks, the prosecutor again emphasized Ford's identification.  While the prosecutor spoke, Ford sat in the courtroom without objection from Moore.

¶31    After opening statements, defense counsel renewed the *Dessureault* objection.  Counsel asserted that Ford had not previously been told that the person she identified in the photo lineup was indeed Moore, and therefore any in-court identification by Ford would be "even more suggestive, and less likely to have a source independent of the previous unduly suggestive out-of-court identification."

¶32    "[I]f [a] pretrial identification comports with due process, subsequent identification at trial does not violate a

defendant's rights merely by following on the heels of the earlier confrontation." *Lehr*, 201 Ariz. at 521 ¶ 52, 38 P.3d at 1184. Because Ford's pretrial identification was otherwise reliable, and therefore did not violate due process, the prosecutor's reference to it in his opening statement does not render inadmissible either the pretrial identification or the later in-court identification.

## B. Guilt-Phase Jury Selection Issues

### 1. *Morgan v. Illinois* Challenge

¶33 In *Morgan v. Illinois*, the Supreme Court held that a capital defendant is entitled, upon request, to inquire whether prospective jurors believe death should always be imposed for the conviction of a capital offense. 504 U.S. 719, 735-36 (1992). Failure to permit such questioning is structural error. *Id.* at 729-30.

¶34 Moore argues that the trial court committed structural error by not asking jurors if they thought the death penalty should be imposed in all cases in which a person knowingly or intentionally kills another, even though counsel had specifically requested a jury questionnaire including such "life-qualifying" questions.

¶35 There was no *Morgan* error here. The trial court declined to use a written juror questionnaire and instead told counsel: "[T]hat is not to suggest that these questions can't

14

and won't be asked."  After conducting oral voir dire, the trial court allowed the prosecutors and defense counsel to question the panel.  Among other questions, Moore's counsel asked: "Is there anyone on the panel here that thinks the death penalty is not given enough in the United States, or this state, for that matter?"  Defense counsel did not ask other life-qualifying questions.

¶36     Because Moore was allowed to question the jurors, he cannot complain that the trial court did not itself ask life-qualifying questions.  *See State v. Moody* (*Moody II*), 208 Ariz. 424, 452 ¶ 98, 94 P.3d 1119, 1147 (2004) ("[A] defendant who believes a trial court's voir dire to be deficient cannot sit on his rights and bypass the opportunity to cure the error . . . .").  The trial court did not prevent defense counsel from asking life-qualifying questions, but instead refused to ask them in a written questionnaire and invited counsel to ask such questions in oral voir dire.

### 2.    *Witherspoon v. Illinois* Challenge

¶37     Moore argues that the trial court erroneously struck three jurors for cause in violation of *Witherspoon v. Illinois*, 391 U.S. 510 (1968).  We review a trial court's decision to strike a potential juror for cause for abuse of discretion. *State v. Jones*, 197 Ariz. 290, 302 ¶ 24, 4 P.3d 345, 357 (2000).

¶38     "A death sentence cannot be upheld if the jury was

15

selected by striking for cause those who 'voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.'" *State v. Ellison*, 213 Ariz. 116, 137 ¶ 88, 140 P.3d 899, 920 (2006) (quoting *Witherspoon*, 391 U.S. at 522). A judge, however, is required to question jurors regarding their opinions on the death penalty, *see, e.g.*, *State v. Anderson* (*Anderson I*), 197 Ariz. 314, 318-19 ¶¶ 7-10, 4 P.3d 369, 373-74 (2000), and, after attempting rehabilitation, must remove a potential juror from the jury pool if the juror's personal views may "prevent or substantially impair the performance of [the juror's] duties." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (internal quotation marks omitted). We defer to the trial judge and a juror's bias need not be proved with unmistakable clarity. *Id.* at 424-25. Instead, "even if a juror is sincere in his promises to uphold the law, a judge may still reasonably find a juror's equivocation 'about whether he would take his personal biases in the jury room' sufficient to substantially impair his duties as a juror, allowing a strike for cause." *Ellison*, 213 Ariz. at 137 ¶ 89, 140 P.3d at 920 (quoting *State v. Glassel*, 211 Ariz. 33, 48 ¶¶ 49-50, 116 P.3d 1193, 1208 (2005)).

¶39      Moore makes two arguments with regard to the striking of the three potential jurors. He primarily argues that the trial court committed structural error under *Anderson I* by

16

striking jurors who had expressed general reservations about the death penalty without specifically asking if they could set aside their beliefs and follow the law. He also suggests that the trial judge abused his discretion in excluding these jurors given their responses to the questions asked.

¶40 During jury selection, the court informed the prospective jurors that if they were selected they would be instructed not to consider the possible punishment in determining guilt or innocence; that if the defendant were found guilty of first-degree murder, the court may impose a sentence of either life imprisonment or death; and that the jury would not determine the sentence. The court then asked the potential jurors: "Do any of you have any conscientious or religious scruples or feeling that would prevent you from voting for first degree murder because of the possible imposition of the death penalty?" In response, three jurors responded affirmatively. After briefly questioning these jurors, the court dismissed each for cause.

¶41 Moore relies on *Anderson I* to argue that the trial court's failure to ask prospective jurors if they could set aside their beliefs and follow the law is itself a structural error that requires reversal. We reject this argument. *Anderson I* held that structural error results if jurors are dismissed based on their generalized answers to a written

17

questionnaire without any opportunity to rehabilitate them through oral voir dire. *Ellison*, 213 Ariz. at 137 ¶ 87, 140 P.3d at 920.

¶42       The court's failure here to specifically ask jurors if they could set aside their beliefs is not analogous to the trial court's refusal in *Anderson I* to allow any oral voir dire after jurors voiced general objections. The Federal Constitution does not dictate a "catechism" for voir dire, and we have recognized that jurors may be excluded for cause even if they affirm that they can set aside their beliefs and follow the law. *Id*. at ¶ 89.

¶43       The issue thus becomes whether, given the questions that were asked and the responses, the trial judge abused his discretion in dismissing Jurors M., S., and G. for cause. These jurors did not merely state general objections to the death penalty. Instead, after the judge explained that the jury would not determine, and should not consider, sentencing, they each stated that their views on the death penalty could affect their ability to decide the merits. Juror M. said that even though the jury was not going to decide punishment, she was so strongly opposed to the death penalty that it *might* affect her ability to decide the case on its own merits. Juror S. said that his feelings about the death penalty would *probably* interfere with how he would decide the case. Finally, Juror G. said there was

18

a *pretty good chance* that her strong feelings about the death penalty would "come into play" in her decision on guilt or innocence.

¶44    Although the trial court asked less extensive follow-up questions than trial courts in many other cases we have considered, *cf. Uttecht v. Brown*, 551 U.S. 1 (2007) (noting that deference to trial court's assessment of prospective demeanor of juror is appropriate when trial court "has supervised a diligent and thoughtful *voir dire*"), given the trial court's prefatory statement that the court and not the jury would decide sentencing, as well as the individual juror's responses, the trial court could reasonably conclude that the views of these prospective jurors might substantially impair the performance of their duties as jurors.

## C. Refusal to Order Drug Test of State's Witness

¶45    Moore asserts that the trial court abused its discretion by refusing to order Ortiz to undergo a drug test to determine if she was under the influence of drugs while testifying.  "We review a trial court's ruling on the competency of a witness for an abuse of discretion."  *State v. Cruz*, 218 Ariz. 149, 166 ¶ 105, 181 P.3d 196, 213 (2008).  A trial court's refusal to order a witness to submit to a drug test is also reviewed for abuse of discretion.  *See State v. Apodaca*, 166 Ariz. 274, 276, 801 P.2d 1177, 1179 (App. 1990).

19

¶46      A witness under the influence of drugs is not necessarily incompetent to testify. *See State v. Ballesteros*, 100 Ariz. 262, 265, 413 P.2d 739, 741 (1966). A witness is competent unless she is so impaired that she cannot coherently respond to questioning. *See Cruz*, 218 Ariz. at 166 ¶ 106, 181 P.3d at 213.

¶47      Ortiz testified during the guilt phase trial; among other things, her testimony placed Moore near the scene of the murders. After her redirect examination, defense counsel asked the trial court to order Ortiz to submit to a urinalysis test to determine whether she was under the influence of drugs. Counsel said that Ortiz was acting strangely because she was talking rapidly and got "off track" during questioning. The court denied the request because it did not view Ortiz's behavior as atypical of a witness. The court stated that Ortiz was coherent, quick to respond to questions, and not slurring her speech.

¶48      The trial court did not abuse its discretion in refusing to order a drug test. The transcript and partial video recording of Ortiz's testimony show that Ortiz was coherent and responded appropriately to questioning, even though she had a tendency to ramble and interrupt counsel. *Cf. id.* ("Although [witness's] testimony was somewhat rambling, it was coherent."). The trial court therefore did not abuse its discretion in

20

finding her competent to testify. Moreover, defense counsel was not prevented from cross-examining Ortiz regarding her drug history or whether she was under the influence of drugs while testifying. *Cf. State v. Orantez*, 183 Ariz. 218, 222-23, 902 P.2d 824, 828-29 (1995) (discussing impeachment of witness based on drug use).

### D. Notice and Sufficiency of Evidence of Burglary and Felony Murder Charges

¶49 With regard to the deaths of Delia and Guadalupe, the indictment charged that Moore had committed first-degree premeditated murder or, in the alternative, had committed first-degree felony murder with a predicate felony of first-degree burglary. The indictment also charged Moore with first-degree burglary, alleging that he, while possessing a handgun, had "with the intent to commit a theft or a felony therein, entered or remained unlawfully in or on the residential structure of Delia Ramos" at East Yale Street. Arizona statutes identify burglary as one of the predicates for felony murder, A.R.S. § 13-1105(A)(2) (Supp. 1999), and define burglary to include unlawfully entering or remaining in a residence with the intent to commit "theft or any felony therein." *Id*. §§ 13-1506, -1507, -1508 (1989).

¶50 Moore argues that he was denied due process because the State did not provide notice until the settling of jury

21

instructions, and after the close of evidence, that it intended to establish burglary based on Moore's entering the house with the intent to commit murder rather than theft. Moore further argues that burglary based on a defendant's intent to murder cannot validly serve as a predicate for felony murder and accordingly there was insufficient evidence to support his felony-murder convictions.

### 1. Notice

¶51 This Court reviews constitutional issues and purely legal issues de novo. *Moody II*, 208 Ariz. at 445 ¶ 62, 94 P.3d at 1140. The Sixth Amendment and due process require that a defendant be given "notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge." *Cole v. Arkansas*, 333 U.S. 196, 201 (1948). Similarly, Arizona Rule of Criminal Procedure 13.2 provides that an "indictment or information shall be a plain, concise statement of the facts sufficiently definite to inform the defendant of the offense charged."

¶52 Moore chiefly relies on *State v. Blakley*, 204 Ariz. 429, 65 P.3d 77 (2003). In *Blakley*, the state initially disclosed sexual assault as the predicate offense for felony murder; at the close of evidence and before closing arguments, however, the state requested a jury instruction that added child abuse as an alternative predicate offense. *Id.* at 439 ¶ 46, 65

P.3d at 87. Blakley had defended the case assuming that sexual assault was the sole predicate felony and had presented evidence suggesting that the victim died of injuries consistent with child abuse rather than sexual assault. *Id.* at 440 ¶ 54. He also identified other evidence he would have presented had he known child abuse was also alleged. *Id.*

¶53 *Blakley* concluded that "[t]he insertion of a new predicate felony after all the evidence was in and the defense had rested constitutes reversible error. The prejudice caused by such late notice was obvious. The defendant was deprived of his constitutional right to a fair trial." *Id.* at ¶ 55. We further noted, "[i]n order to avoid injustice and to ensure that proper notice has been given in a felony murder case, we believe the state should include the predicate felony in the original or an amended indictment." *Id.* at ¶ 56.

¶54 Moore's case is distinguishable from *Blakley*. Moore does not argue that the State charged or argued one theory and then attempted to adopt another after the close of evidence. Instead, Moore complains that the State, while charging felony murder based on burglary, did not specify until the settling of jury instructions, and after the close of evidence, that burglary would be defined by his intent to commit murder rather than theft.

¶55 We agree with Moore that *Blakley* implies that the

23

state should identify before trial the particular felony that will be used to define burglary when the latter crime is the predicate for felony murder. But *Blakley* itself recognizes that the state's failure to specify the predicate felony before trial will not be reversible error if the defendant otherwise has notice and an opportunity to respond to the accusations. *See id.* at 439-40 ¶¶ 50, 52, 65 P.3d at 87-88. *Blakley* explained that in *State v. Arnett*, 158 Ariz. 15, 18, 760 P.2d 1064, 1067 (1988), the Court found adequate notice when the state mentioned the predicate felony on the first day of trial, "giving defense counsel a reasonable chance to rebut the allegation." *Blakley*, 204 Ariz. at 439 ¶ 50, 65 P.3d at 87. Similarly, in *State v. Eastlack*, 180 Ariz. 243, 258, 883 P.2d 999, 1014 (1994), the Court rejected the defendant's argument that he had received inadequate notice that kidnapping would be used as a predicate felony when the defendant failed to show either prejudice or unfair surprise.

¶56 Like the defendants in *Eastlack* and *Arnett*, Moore was not denied notice of the predicate felony in a way that violates due process or otherwise constitutes reversible error. Although the State did not specifically identify until after the close of evidence that the predicate burglary would itself be based on Moore's intent to murder, he had both notice and an opportunity to defend against the underlying accusations. Moore had notice

24

he was accused of entering or remaining in the Yale Street house with the intent to murder because he was charged with the premeditated murders of Guadalupe and Delia and with first-degree burglary of the house.

### 2. Felony Murder and the Merger Doctrine

¶57 Relying on *State v. Essman*, 98 Ariz. 228, 403 P.2d 540 (1965), Moore also argues that under the merger doctrine, felony murder cannot be predicated upon a burglary that is itself based on the intent to murder.

¶58 In *Essman*, the Court held that the trial court had erred by instructing the jury that the felony-murder doctrine could apply based on assault with a deadly weapon. *Id.* at 235, 403 P.2d at 545. Although Arizona statutes did not identify assault as a predicate for felony murder, the Court reasoned more generally that allowing assault to serve as a predicate would eliminate any requirement of proof of premeditation for nearly all first-degree murders. *See id*. at 235-36, 403 P.2d at 545. Quoting Judge Cardozo, the Court observed:

> "The felony that eliminates the quality of the intent must be one that is independent of the homicide and of the assault merged therein, as e.g., robbery or larceny or burglary or rape."

*Id.* (quoting *People v. Moran*, 158 N.E. 35, 36 (1927)).

¶59 Later Arizona cases implicitly rejected the broad language in *Essman* suggesting that the predicate felony must be

25

"independent of the homicide." For example, in *State v. Miniefield*, the defendant argued that it was fundamental error to charge him with felony murder by arson because "the arson was merely the use of fire to attempt to kill the victim." 110 Ariz. 599, 601, 522 P.2d 25, 27 (1974). The Court rejected this argument by noting that the felony murder statute provided that when a person commits arson and the arson results in death it is first-degree murder. *Id.* at 602, 522 P.2d at 28. "The statute does not draw a distinction between a person who intends to kill another by fire and one who only intends to burn down a dwelling house and accidentally kills one of the occupants." *Id.; see also State v. Lopez*, 174 Ariz. 131, 141-42, 847 P.2d 1078, 1088-89 (1992) (distinguishing *Essman*).

¶60     Most recently, the Court distinguished *Essman* in *State v. Dann* (*Dann I*), 205 Ariz. 557, 74 P.3d 231 (2003). There, the defendant argued that because he intended to murder a victim rather than assault him, he could not be convicted of felony murder. *Id.* at 567 ¶ 29, 74 P.3d at 241. Noting that the defendant did not dispute that felony murder could be predicated on burglary based on intent to commit assault, the Court held that sufficient evidence supported the finding of the predicate offense. *Id.* at 567-68 ¶¶ 27-29, 74 P.3d at 241-42. The Court further observed that "[m]erger does not apply in cases in which

26

the separate crime of burglary is alleged and established." *Id.* at 568 n.7 ¶ 29, 74 P.3d at 242 n.7.

**¶61** *Dann I* and *Miniefield* defeat Moore's argument that felony murder cannot be predicated on a burglary that is based on the intent to murder. The felony murder statute, A.R.S. § 13-1105(A)(2), does not distinguish between burglaries defined by intent to commit assault versus intent to murder. It would, moreover, be anomalous to conclude that first-degree murder occurs if a burglary with intent to assault results in death but not if the burglary is based on the more culpable intent to murder.

**¶62** Moore notes that courts in several other states have held that a felony-murder conviction cannot be based on a burglary intended solely to murder the victim. *See Parker v. State*, 731 S.W.2d 756, 758-59 (Ark. 1987); *People v. Garrison*, 765 P.2d 419, 435 (Cal. 1989); *People v. Wilson*, 462 P.2d 22, 27-28 (Cal. 1969); *Williams v. State*, 818 A.2d 906, 910-13 (Del. 2002); *People v. Cahill*, 809 N.E.2d 561, 588-89 (N.Y. 2003). We find these cases unpersuasive because we have already recognized that Arizona's felony-murder statute identifies burglary based on assault as a valid predicate offense; these out-of-state cases conflict with *Miniefield* and *Lopez* insofar as they require the predicate offense to be separate or independent from the homicide, and our Court in *Lopez* distinguished Arizona's felony

27

murder scheme from that of California. 174 Ariz. at 142, 847 P.2d at 1089. *Cf. People v. Farley*, 2009 WL 1886072, No. S024833 (Cal. July 2, 2009) (overruling *Wilson* and holding merger doctrine does not apply to first-degree felony murder).

¶63 We therefore reject Moore's use of the merger doctrine to challenge his convictions for felony murder.

## E. Definition of Premeditation

¶64 Moore argues that the trial court incorrectly instructed the jury that "proof of actual reflection is not required" to establish premeditation and the prosecutor's closing argument compounded this error.

¶65 The use of the phrase "proof of actual reflection is not required" is an erroneous instruction on premeditation if given in a jury instruction "without further clarification." *State v. Thompson*, 204 Ariz. 471, 480 ¶ 34, 65 P.3d 420, 429 (2003); *accord Dann I*, 205 Ariz. at 565 ¶ 16, 74 P.3d at 239.

¶66 Here, the court instructed the jury that

> "[p]remeditation" means that a person acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. Proof of actual reflection is not required, but an act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

28

During closing arguments the prosecutor reinforced the court's instruction by repeatedly telling the jury that Moore "had time to reflect" with respect to the murders.

¶67        Moore properly objected to the instruction, and the State correctly concedes that it was erroneous.  Accordingly, we must determine if the error was harmless.  *Dann I*, 205 Ariz. at 565 ¶ 18, 74 P.3d at 239.  "An error is harmless if it appears beyond a reasonable doubt that the error . . . did not contribute to the verdict obtained."  *Id.* (alteration in original) (internal quotation marks omitted).

¶68        The State argues that Moore was not prejudiced by the erroneous premeditation instruction because he pursued a mistaken identity offense.  We have previously rejected a similar argument in the context of harmless error review.  *See State v. Gomez*, 211 Ariz. 494, 499–500, 123 P.3d 1131, 1136–37 (2005); *Dann I*, 205 Ariz. at 566 & n.3 ¶¶ 19–20, 74 P.3d at 240 & n.3.

¶69        There was, however, overwhelming evidence of Moore's premeditation with respect to the murder of Mata.  Before leaving his mother's house with his gun, Moore told his girlfriend that he had seen the person who had tried to run him over and he was not going to stand for it.  He later told Brown that he was going to "smoke" Mata and asked if Brown wanted to "get" Mata with him.  When Mata came outside, Moore confronted

29

him by asking if Mata had a problem with him and then began shooting. Moore told Borghetti after the shootings that he had shot the person who had tried to run him over and he was sorry about the other victims who "didn't have anything to do with it." Given this evidence, the error in the premeditation instruction was harmless beyond a reasonable doubt with regard to the murder of Mata.

¶70 In contrast, the evidence of premeditation is less compelling with regard to the other victims. The State argues that premeditation was established because Moore, after shooting Mata and Ford, "entered the house and hunted for Guadalupe and Delia." The State's assertion that Moore "hunted" for the victims is based on the fact that Moore entered the house, shot Guadalupe in his sleep, and then immediately shot Delia as she hid behind a pillow in the closet of another room.

¶71 In *Dann I*, the Court did not find overwhelming evidence of premeditation based on the defendant's killing the victims by placing his gun muzzle against their heads or his later making incriminating statements about his motives for these shootings. *See Dann I*, 205 Ariz. at 566 ¶ 20, 74 P.3d at 240. This Court also noted that this evidence had to be considered in light of the court's erroneous instruction and the prosecutor's statements in closing that the passage of time alone would support a finding of first-degree murder. *See id.*

at 565 ¶ 16, 74 P.3d at 239.

¶72　　　　Consistent with *Dann I*, the evidence here is not so overwhelming that this Court can conclude, beyond a reasonable doubt, that the error in the premeditation instruction did not affect the verdicts as to Delia and Guadalupe.　We therefore reverse the convictions for the premeditated murders of Delia and Guadalupe.　Because Moore remains convicted of felony murder for their deaths, however, remand is unnecessary.

### F. Lesser-Included Offense Instruction

¶73　　　　Moore argues that the trial court committed fundamental error by instructing the jury that it could find the defendant guilty of second-degree murder only if it unanimously found that the State had failed to prove first-degree murder beyond a reasonable doubt, but did prove the less serious crime beyond a reasonable doubt.

¶74　　　　This Court disapproved such an "acquittal-first" instruction in *State v. LeBlanc*, 186 Ariz. 437, 438-39, 924 P.2d 441, 442-43 (1996).　Because Moore's counsel did not object to the instruction at trial, we review for fundamental error. *State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005).

¶75　　　　The use of the instruction, although erroneous in light of *LeBlanc*, does not constitute fundamental error.　The error is not fundamental in nature because Moore has not shown

31

that it denied him a fair trial or deprived him of a right essential to his defense. *See id.* at 567 ¶ 19, 115 P.3d at 607. Although *LeBlanc* disapproved of the instruction's prospective use, the Court expressly noted that the instruction does not violate the state or federal constitutions, that its use is not fundamental error, and that the adoption of a new instruction was a procedural change made for purposes of judicial administration. *See LeBlanc*, 186 Ariz. at 439-40, 924 P.2d at 443-44. We reject Moore's argument that once *LeBlanc* disapproved the instruction, its subsequent use necessarily makes the error fundamental.

## G. Right to Conflict-Free Counsel

¶76 Moore argues that he was denied his Sixth Amendment right to conflict-free counsel when, after he had been convicted in his first trial, the trial court denied two motions for substitute counsel before the sentencing trials.

¶77 A trial court's decision to deny a request for new counsel will not be disturbed absent an abuse of discretion. *State v. Cromwell*, 211 Ariz. 181, 186 ¶ 27, 119 P.3d 448, 453 (2005). "The presence of an irreconcilable conflict or a completely fractured relationship between counsel and the accused ordinarily requires the appointment of new counsel." *Id.* at ¶ 29. Disagreements over defense strategy do not constitute an irreconcilable conflict. *Id.*

32

**¶78**     In 2002, Moore's counsel moved to withdraw on the grounds that there was an irreconcilable conflict between them and Moore.  The identified conflict concerned the evidence to be presented at sentencing.    Moore desired to maintain his innocence and to offer testimony by an alibi witness (whom counsel, with Moore's agreement, decided not to call at the guilt trial) and also to inform the jury, in allocution, that he had passed a polygraph examination after his convictions. Moore's counsel instead wanted to present Moore's drug use as mitigation.    The trial court denied the motion to withdraw on the grounds that the conflict concerned sentencing strategy.

**¶79**     Moore contends that determining what evidence to present at a capital sentencing trial is a "fundamental decision" that must be made by the defendant himself, and not merely a strategic decision to be made by his lawyers.  *Cf. Jones v. Barnes*, 463 U.S. 745, 751 (1983) (recognizing that defendant has "ultimate authority" over certain "fundamental decisions regarding the case" including whether to plead guilty, waive a jury trial, testify on his own behalf, or take an appeal).

**¶80**     The trial court did not abuse its discretion in denying the motion to withdraw.    Recognizing that certain decisions during the sentencing phase of a capital case may be fundamental, we do not regard Moore's desire to present evidence

33

of actual innocence to be such a decision. The trial court properly precluded evidence of actual innocence from the sentencing phase. *See* infra ¶¶ 107-09. A defendant's desire to present inadmissible evidence contrary to counsel's sentencing strategy does not give rise to an irreconcilable conflict.

¶81    Moore's counsel again sought to withdraw in 2003, this time arguing that they had an actual conflict because their office had previously represented a statutory victim in the case who did not want to testify. This victim, counsel avowed, knew that other persons wanted to kill the victims, which would be relevant to residual doubt, and that the victims were drug dealers, which could rebut any victim impact evidence the State might present. Moore's counsel argued that new counsel could call the witness in question without violating any ethical rules. After a hearing, the trial court denied the motion because Moore had failed to show the witness could offer any relevant, noncumulative information.

¶82    To succeed on a conflict of interest claim, a defendant must prove the existence of an actual conflict that adversely affected counsel's representation. *State v. Jenkins*, 148 Ariz. 463, 465-66, 715 P.2d 716, 718-19 (1986). To establish an actual conflict, a defendant must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. *Id.* at 466 n.1, 715 P.2d at 719 n.1.

34

¶83     The trial court correctly denied the second motion to withdraw. Moore has not shown that there was a plausible alternative defense strategy that could have been pursued absent the alleged conflict. Moore argues that a conflict-free lawyer could have subpoenaed the former client and forced him to testify. This possibility, however, was not a plausible alternative strategy because the witness's contemplated testimony concerned either residual doubt, which would not have been admissible at sentencing, or rebuttal of victim impact evidence, which the State did not introduce. Moore has not shown that the identified conflict adversely affected his counsel's representation.

## H. (F)(8) Aggravator

¶84     Moore contends that trial court erroneously failed to completely instruct the jury on the elements of the (F)(8) aggravator at the first sentencing trial, that the instruction given was unconstitutionally vague, and that structural error occurred.

¶85     This Court reviews de novo whether "instructions to the jury properly state the law." *See Glassel*, 211 Ariz. at 53 ¶ 74, 116 P.3d at 1213. Because Moore did not object to the jury instruction at the first sentencing trial, we review for fundamental error. *See Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

35

¶86     To prove the (F)(8) aggravator, the State must establish beyond a reasonable doubt that the murders took place during a "continuous course of criminal conduct" and were "temporally, spatially, and motivationally related." *State v. Armstrong* (*Armstrong III*), 218 Ariz. 451, 464 ¶ 67, 189 P.3d 378, 391 (2008). The instruction here instead required only a finding that the homicides were "committed on the same occasion," and was therefore erroneous, which the State concedes. *See State v. Ring* (*Ring III*), 204 Ariz. 534, 560-61 ¶¶ 80-81, 65 P.3d 915, 941-42 (2003).

¶87     Moore must also show prejudice to establish that the incomplete instruction was fundamental error. He cannot meet this burden because the record of Moore's first sentencing trial demonstrates a temporal, spatial, and motivational relationship substantial enough that no reasonable jury could fail to find the (F)(8) aggravator beyond a reasonable doubt. *See State v. Armstrong* (*Armstrong II*), 208 Ariz. 360, 364-65 ¶ 11, 93 P.3d 1076, 1080-81 (2004). Ford's uncontroverted testimony established the temporal element because within seconds, she saw Moore shoot Mata and her and then heard multiple gunshots. *See State v. Dann* (*Dann II*), 206 Ariz. 371, 373 ¶ 9, 79 P.3d 58, 60 (2003) (finding temporal element established when murders occurred in a "short, uninterrupted span of time"). The spatial element was established by the uncontested evidence that

36

Guadalupe and Delia were shot inside the Yale Street house, while Mata was shot just outside the front door. *See State v. Tucker* (*Tucker I*), 205 Ariz. 157, 169 ¶ 66, 68 P.3d 110, 122 (2003) (noting that spatial relationship was established when victims were in different rooms of an apartment). Finally, no reasonable jury could fail to find the motivational element because the murders involved a continuous course of criminal conduct and "it is difficult to imagine a motive for the killings unrelated to the murder of [Mata]." *See id.; see also State v. Boggs*, 218 Ariz. 325, 342 ¶ 81, 185 P.3d 111, 128 (2008) (upholding (F)(8) aggravator where "all the murders involved a continuous course of criminal conduct").

¶88    We also reject Moore's arguments that the (F)(8) instruction here was facially vague or that we should reconsider *Ring III* and hold that a jury finding of an aggravator based on an incomplete instruction is structural error.

I.  **Sentencing Jury Did Not Decide Guilt or Aggravating Circumstance**

¶89    Moore argues that his death sentences must be reversed because the second sentencing jury did not itself find the (F)(8) aggravator. He contends that because the first sentencing jury invalidly found the (F)(8) aggravator based on a flawed jury instruction, the State should have been required to reprove this aggravator. He argues that this situation is

37

analogous to *State v. Pandeli* (*Pandeli IV*), 215 Ariz. 514, 522 ¶ 15, 161 P.3d 557, 565 (2007), which recognizes that when a capital sentence is vacated and remanded for resentencing, the State must reprove the aggravating circumstances. *Pandeli IV* is inapposite because neither Moore's capital sentence nor the first jury's finding of the (F)(8) aggravator was vacated.

¶90 We also reject Moore's related argument that the second sentencing jury could not properly determine his sentence in a "vacuum." Substantially the same evidence was introduced at the second sentencing trial as at the guilt phase trial and the first sentencing trial. There was extensive presentation of mitigation evidence. The second sentencing jury was therefore able to make an individualized determination of Moore's sentence consistent with the case law of the Supreme Court and this Court. *See Tuilaepa v. California*, 512 U.S. 967, 972 (1994); *State ex rel. Thomas v. Granville* (*Baldwin*), 211 Ariz. 468, 472 ¶ 17, 123 P.3d 662, 666 (2005).

¶91 Moore also argues that notwithstanding *Lockhart v. McCree*, 476 U.S. 162 (1986), juries should no longer be death qualified because "they unconstitutionally stack the deck against a capital defendant." We have previously upheld death qualification of jurors. *See, e.g.*, *State v. Dann* (*Dann III*), 220 Ariz. 351, ___ ¶ 28, 207 P.3d 604, 613 (2009); *State v. Bocharski*, 218 Ariz. 476, 483 ¶ 18, 189 P.3d 403, 410 (2008).

38

¶92     Finally, Moore argues that permitting a jury to impose a death sentence when it did not determine his guilt or the (F)(8) aggravator violates the Sixth and Eighth Amendments because the jury that sentenced him to death was able to abdicate its responsibility to the other juries. Under *Caldwell v. Mississippi*, "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. 320, 328-29 (1985).

¶93     We have previously concluded that *Caldwell*'s dictate is not violated when different juries determine guilt and sentence if the sentencing jury is not misled as to its role. *Dann III*, 220 Ariz. at ___ ¶¶ 29-30, 207 P.3d at 613-14; *Bocharski*, 218 Ariz. at 483 ¶ 20, 189 P.3d at 410; *State v. Anderson (Anderson II)*, 210 Ariz. 327, 337 ¶¶ 21-23, 111 P.3d 369, 379 (2005). Moore argues, however, that this Court has never sanctioned a bifurcation of the aggravation phase and penalty phase juries. But this kind of bifurcation is not substantively different from the bifurcation sanctioned under our prior cases, and it did not mislead the sentencing jury to believe that the responsibility for determining Moore's sentence would rest elsewhere. Moore's sentencing jury received clear instruction that it alone was responsible for the sentencing

39

decision.  Therefore, *Caldwell* was not violated.

## J. Sentencing Jury Voir Dire

¶94      Moore argues that the trial court deprived him of his right to a fair and impartial sentencing jury by refusing to strike pro-death jurors and restricting his questions to potential jurors about their views on mitigation.

¶95      *Morgan* requires that defendants be afforded an opportunity during voir dire to identify, and to strike for cause, prospective jurors who would automatically impose the death penalty once guilt is found.  *See Glassel*, 211 Ariz. at 45-46 ¶¶ 37-41, 116 P.3d at 1205-06.  *Morgan* does not, however, entitle defendants to ask prospective jurors to identify circumstances they would find mitigating or to answer open-ended questions about their views on mitigation.  *See id.* at 45-47 ¶¶ 37, 42-44, 116 P.3d at 1205-07.

¶96      Trial court rulings on the scope of voir dire and whether to strike jurors for cause are reviewed for abuse of discretion.  *State v. Smith*, 215 Ariz. 221, 230 ¶ 37, 159 P.3d 531, 540 (2007); *Ellison*, 213 Ariz. at 137 ¶ 88, 140 P.3d at 920.  If a defendant is forced to use a peremptory challenge to remove a juror who should have been excused for cause, an otherwise valid conviction will not be reversed unless the defendant shows prejudice.  *State v. Hickman*, 205 Ariz. 192, 198 ¶ 28, 68 P.3d 418, 424 (2003).

40

### 1.    Denial of the Motions to Strike

¶97      Moore contends that the trial court misapplied *Morgan* and improperly denied his motions to strike prospective Jurors 4, 9, 22, 61, 62, and 122.

¶98      Only one of these six jurors – Juror 9 – was selected for the jury.  In her responses during voir dire, Juror 9 indicated that she would listen to all of the evidence and the instructions and could decide between a sentence of life or death depending on the facts.  Defense counsel did not object that Juror 9 would automatically vote for a death sentence.  Instead, counsel argued that she should be disqualified because she had said, in response to a question from defense counsel, that she did not think age would make a difference to her as a mitigating factor.  As the trial court noted, the juror had not been instructed on the law and was being posed the question in a vacuum.  Given Juror 9's other responses to the voir dire questions, the trial court did not abuse its discretion in denying the motion to strike.

¶99      Jurors 4, 22, 61, 62 and 122 did not sit on the jury.  Thus, under *Hickman,* any error by the trial court in refusing to strike them was not reversible error absent prejudice to Moore.  *See Glassel*, 211 Ariz. at 50 ¶ 56-57, 116 P.3d at 1210.  No evidence suggests that the sentencing jury was not fair and impartial.  We reject Moore's argument that *Hickman* should not

apply because the trial court systematically misapplied *Morgan*. Consistent with *Morgan*'s requirements, prospective jurors were asked questions in both a twelve-page jury questionnaire and in oral voir dire aimed at identifying those who would automatically impose the death penalty.

### 2. Restrictions on voir dire regarding mitigation

¶100     Moore argues that the trial court refused to allow him to "meaningfully" question "many additional" jurors on "whether they were open to considering *any* evidence of mitigation." In this regard, Moore cites to the transcripts of the oral voir dire of eleven prospective jurors, but five were not empanelled and two were designated as alternates and did not deliberate. Any error in the voir dire of these seven jurors was harmless. *See Glassel*, 211 Ariz. at 46 ¶ 41, 116 P.3d at 1206 (stating that alleged error in restricting voir dire was harmless as to jurors that did not participate in deliberations).

¶101     With regard to the remaining jurors who were empanelled – Jurors 27, 77, 196, and 210 – Moore sought to strike for cause all but Juror 77. The question becomes whether the court abused its discretion in restricting Moore's voir dire or denying his motions to strike these jurors.

¶102     The four identified jurors each completed a written questionnaire and answered questions in oral voir dire. None indicated that they would automatically impose the death

42

penalty. We are not persuaded by Moore's arguments that the trial court's restrictions on voir dire regarding mitigation violated *Morgan.*

¶103    The trial court refused to allow Moore to ask Juror 27 what things she would or would not consider mitigating. The trial court also sustained an objection when Moore asked Juror 77 if there were particular areas the juror would want to hear about. With respect to Juror 196, the trial court sustained the State's objection when counsel asked "how can you tell us that you'd be open minded to consider all mitigation without knowing anything about what might be out there?" Defense counsel was allowed, however, to ask this juror if she was open minded and if "there [were] some things that you're not open minded about?" With regard to Juror 210, the trial court sustained objections to open-ended questions asking the juror to identify what she thought were "good reasons" for having or not having a death penalty. The trial court did allow Moore to ask this juror whether "there [are] some cases in particular in which you think the death penalty would be justified, some cases where you would be less open minded?"

¶104    The trial court's restrictions on voir dire were consistent with this Court's decisions. We have repeatedly rejected arguments that *Morgan* requires courts to allow defendants to ask prospective jurors to identify circumstances

43

that they would find mitigating or to respond to open-ended questions on this topic. For example, in *Glassel*, this Court held that *Morgan* does not require that courts permit defendants to question prospective jurors as to their understanding of the phrase "sufficiently substantial to call for leniency." 211 Ariz. at 46 ¶ 40, 116 P.3d at 1206. The Court also rejected the use of open-ended questions about the mitigating circumstances a juror would consider important in deciding whether to impose death. *Id*. at ¶ 44.

¶105 The Court further narrowed the scope of sentencing jury voir dire in *State v. Johnson*, 212 Ariz. 425, 435 ¶ 33, 133 P.3d 735, 745 (2006). In that case, the Court held that *Morgan* does not require courts to allow defendants to ask prospective jurors about their views on specific mitigating circumstances. *Id*. In *Smith*, the Court held that trial courts may prohibit open-ended questions seeking to determine a juror's views "about the best reason for having or not having the death penalty, the importance of considering mitigation, and the type of offense for which the juror would consider death to be appropriate." 215 Ariz. at 231 ¶ 41, 159 P.3d at 541.

¶106 Under these precedents, the questions that Moore sought to ask prospective jurors about their views on mitigation were not required by *Morgan*. Accordingly, the trial court did

not abuse its discretion in limiting voir dire or denying Moore's related motions to strike Jurors 27, 196 and 210.

### K. Preclusion of Actual Innocence Evidence and Argument

¶107    Moore next asserts that the trial court's preclusion of evidence and argument regarding actual innocence violates his rights to due process, to present a complete defense, and to have his sentencer consider all relevant mitigation, as well as the prohibition against ex post facto laws. Moore sought at sentencing to introduce expert testimony on eyewitness identification and evidence that he passed a polygraph examination after the jury found him guilty, and to argue residual doubt as a mitigating factor. On the State's motion, the trial court precluded all evidence on residual doubt from both the aggravation and penalty phases.

¶108    We have previously rejected the argument that trial courts are constitutionally or statutorily required to admit evidence or permit argument regarding residual doubt at a sentencing trial. *See State v. Harrod* (*Harrod III*), 218 Ariz. 268, 281 ¶ 46, 183 P.3d 519, 532 (2008); *State v. Garza*, 216 Ariz. 56, 70 ¶ 67, 163 P.3d 1006, 1020 (2007); *see also Oregon v. Guzek*, 546 U.S. 517, 523 (2006) ("We can find nothing in the Eighth or Fourteenth Amendments that provides a capital defendant a right to introduce new evidence of this kind at sentencing."). Moore attempts to distinguish his situation by

arguing that actual innocence evidence should be admitted because the (F)(8) aggravator focuses on the defendant's role in the murders. However, in *Dann III* we specifically rejected using residual doubt evidence at the aggravation phase to disprove the (F)(8) aggravator when the evidence is to be used only to disprove guilt. *See Dann III*, 220 Ariz. at ___ ¶¶ 66-69, 207 P.3d at 618-19.

¶109    In *Dann III*, we also rejected the claim that preclusion of residual doubt evidence is an ex post facto law. *Id.* at ___ ¶¶ 119-20, 207 P.3d at 625. Moore also argues that the preclusion of residual doubt evidence violated his right to due process because his trial strategies assumed that the judge presiding over his guilt trial could consider residual doubt in determining the sentence. This argument, however, mistakenly presumes that, before jury sentencing, Moore had a right to have residual doubt considered as mitigation. This Court had never recognized such a right and more recent cases have clarified that a defendant has no constitutional right to present residual doubt evidence at sentencing. *See Harrod III*, 218 Ariz. at 278-81 ¶¶ 37-46, 183 P.3d at 528-31.

**L. Constitutionality of Burden of Proof at Sentencing**

¶110    Moore argues that Arizona's death penalty scheme is unconstitutional under the Eighth and Fourteenth Amendments because it does not require the State to prove beyond a

46

reasonable doubt that mitigating circumstances are not "sufficiently substantial to call for leniency."

¶111     This Court, as Moore acknowledges, has previously rejected this argument. *See, e.g.*, *Glassel*, 211 Ariz. at 52 ¶ 70, 116 P.3d at 1212.   Moore argues, however, that under *Kansas v. Marsh*, 548 U.S. 163 (2006), when a state allows the jury to decide whether the death penalty is appropriate, the issue is an element of the offense of capital murder that must be proven by the state beyond a reasonable doubt.

¶112     We have rejected this reading of *Marsh*.   That opinion does not hold that the Federal Constitution requires the state to prove that mitigating circumstances do not warrant leniency; instead, as we noted in *State v. Tucker (Tucker II)*, the Supreme Court held that so long as the state is required to prove the elements of the offense and aggravating circumstances, the state may place on the defendant "the burden of proving mitigating circumstances sufficiently substantial to call for leniency." 215 Ariz. 298, 316 ¶ 67, 160 P.3d 177, 195 (2007) (internal quotation marks omitted).   For this reason, we held that instructing a jury that the defendant had the burden of proving mitigation was sufficiently substantial to warrant leniency, although contrary to our decision in *Baldwin*, did not constitute fundamental error. *See id*. at 316-17 ¶ 69, 160 P.3d at 195-96.

47

¶113    The trial court here did not err by instructing the jury, consistent with *Baldwin*, that the determination of the appropriate sentence is not a fact question on which either side has a burden of proof.

**M. Independent Review**

¶114    Because the murders occurred before August 1, 2002, this Court must "independently review the trial court's findings of aggravation and mitigation and the propriety of the death sentence."  A.R.S. § 13-755 (Supp. 2009); *see* 2002 Ariz. Sess. Laws, ch. 1, § 7 (5th Spec. Sess.).

**1.    Aggravating Circumstance – (F)(8)**

¶115    As discussed in Part H above, the evidence presented during aggravation establishes beyond a reasonable doubt that the murders were temporally, spatially, and motivationally related as required for the (F)(8) aggravator.

**2.    Mitigating Circumstances**

¶116    Moore presented evidence related to two statutory mitigating factors and several non-statutory mitigating factors.

**a. Statutory Mitigation**

**i.  Intoxication**

¶117    To establish intoxication as a statutory mitigator, a defendant must prove by a preponderance of the evidence that "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law

48

was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13-703(G)(1) (Supp. 1999).

¶118    Moore established that he used crack cocaine in the days and hours leading up to the murders. Dr. Stan Cabanski, who performed a juvenile court psychological evaluation on Moore when he was seventeen years, eight months old, concluded Moore was abusing several street drugs. Moore also offered the expert testimony of Dr. Alex Stalcup, a doctor specializing in addiction medicine. Stalcup concluded that Moore had been addicted to crack since age fifteen, that Moore's drug use had impaired his brain development and impulse control, and that Moore had committed the murders in an explosive rage caused by his craving for cocaine. He further opined that Moore's irritability would have been enhanced by his diabetes if his blood sugar was low because he had not eaten.

¶119    To rebut Moore's evidence, the State offered testimony by Dr. Eugene Almer, who acknowledged that Moore had a cocaine habit and had smoked crack before the murders, but opined that Moore's acts the morning of the shooting were volitional. He noted that although Moore showed signs of anger or rage earlier in the evening when he informed his girlfriend that he intended to confront the person who tried to run him over, there were no signs of rage immediately before the shooting. Dr. Almer also noted that Moore made efforts to avoid detection by not leaving

49

behind fingerprints or cigarette butts.  Neither Dr. Stalcup nor Dr. Almer interviewed or otherwise examined Moore; they based their conclusions on reviewing trial evidence and other information.

¶120     Based on our review of the record, we do not find that Moore has established the statutory mitigator of intoxication. "[A] defendant's claim of alcohol or drug impairment fails when there is evidence that the defendant took steps to avoid prosecution shortly after the murder, or when it appears that intoxication did not overwhelm the defendant's ability to control his physical behavior."  *State v. Reinhardt*, 190 Ariz. 579, 591-92, 951 P.2d 454, 466-67 (1997).  Moore took steps to avoid prosecution and we do not find that his use of crack cocaine overwhelmed his ability to control his behavior.

¶121     Although Moore's evidence of impairment from his crack cocaine use does not satisfy the statutory mitigation requirements, we will consider such evidence as non-statutory mitigation.  *See State v. Gallegos* (*Gallegos I*), 178 Ariz. 1, 17-18, 870 P.2d 1097, 1113-14 (1994).

### ii. Age

¶122     In assessing age as a mitigating circumstance, the Court considers the defendant's chronological age, as well as "his level of intelligence, maturity, past experience, and level

of participation in the killings." *State v. Poyson,* 198 Ariz. 70, 80 ¶ 37, 7 P.3d 79, 89 (2000).

**¶123** Moore was eighteen years, seven months old at the time of the murders. Although his teachers testified that he was intelligent, Moore was held back a year in elementary school. Further, Moore stopped attending school in the ninth grade. He appears to have lacked maturity, possibly due to his crack cocaine use, which the experts agreed stunted his emotional development. Although Moore had a child, he lived with his mother and never consistently held a job.

**¶124** Moore also had extensive experience with the juvenile justice system. By the time he became an adult, he had twelve referrals to juvenile court. Although criminal history typically lessens the mitigating weight assigned to age, *see id.*, we do not believe Moore's juvenile record should have a similar effect because he was never adjudicated delinquent and the offenses were all non-violent. That is not to say, as Moore argues, that the failure of the criminal justice system to hold him accountable as a juvenile itself qualifies as mitigation.

**¶125** Moore was the sole participant in the murders, a fact that tends to reduce any mitigating significance of his age.

**¶126** On balance, we conclude that Moore's age deserves some weight as a mitigating factor.

### b. Non-Statutory Mitigation

#### i. Appellant's addiction to crack cocaine

¶127 Moore has clearly established his use of crack cocaine, both habitually and on the night of the shootings, and this factor combined with Moore's relative youth and early-onset drug use, which likely impacted his mental development, deserves some mitigating weight.

#### ii. Appellant's dysfunctional childhood

¶128 A difficult family background may be a mitigating circumstance in determining whether a death sentence is appropriate; however, we give this factor little weight absent a showing that it affected the defendant's conduct in committing the crime. *State v. Sansing* (*Sansing II*), 206 Ariz. 232, 240-41 ¶¶ 34-36, 77 P.3d 30, 38-39 (2003).

¶129 Moore established that he had a dysfunctional childhood. His father suffered from depression and flashbacks related to his service in the Vietnam War. He testified that he was a chronic alcoholic and that his children grew up watching him kill himself by drinking. Before the murders, Moore's father had stopped communicating with his family.

¶130 As a child, Moore was often depressed and kept to himself. His mother filed for divorce when he was in eighth grade, and Moore soon thereafter began running away from home. Approximately one month before Moore's eighth grade graduation,

and weeks after his fifteenth birthday, police stopped Moore in an area known for drug activity. Moore skipped his graduation and was arrested that day for consumption of alcohol as a minor.

¶131 On several occasions, Moore's mother kicked Moore out of the house. Because he was a minor, the police made her take him back. Ultimately she filed papers with the courts unsuccessfully seeking to have Moore declared incorrigible. Moore's twelve referrals to juvenile court included several involving possession of drug paraphernalia.

¶132 Moore has offered sufficient evidence to prove that he was raised in a dysfunctional environment, but we do not find that it merits significant weight as a mitigating factor independent of his drug use as a youth.

### iii. Residual doubt

¶133 Once a person is found guilty beyond a reasonable doubt, claims of innocence or residual doubt do not constitute mitigation for sentencing purposes. *See Dann III*, 220 Ariz. at ___ ¶ 136, 207 P.3d at 628; *Harrod III*, 218 Ariz. at 280 ¶¶ 42-43, 183 P.3d at 531.

### iv. Appellant's family support and impact on his family

¶134 "The existence of family ties is a mitigating factor." *State v. McGill*, 213 Ariz. 147, 162 ¶ 67, 140 P.3d 930, 945 (2006). During the penalty phase, Moore's mother, father,

53

sisters, and grandmother provided testimony or interviews expressing their love for Moore and indicating that his family, including his daughter who was eighteen months old at the time of the murders, would be negatively impacted by his execution. Although Moore established this mitigating factor, we give it minimal weight. *See Poyson*, 198 Ariz. at 82 ¶ 47, 7 P.3d at 91.

### v. Appellant has expressed remorse

¶135    Remorse may be a non-statutory mitigating circumstance, but we give this factor little weight when a defendant denies responsibility for his or her conduct. *See Dann III*, 220 Ariz. at ___ ¶ 150, 207 P.3d at 629; *State v. Andriano*, 215 Ariz. 497, 512 ¶ 76, 161 P.3d 540, 555 (2007).

¶136    Although Moore points to statements he made to Borghetti and his sister as indicating remorse, these statements carry little weight given that Moore continues to deny responsibility for the murders. His comments to his sister express regret about the impact on his family rather than remorse about the murders. Moore has not established remorse by a preponderance of the evidence.

### 3. Propriety of Death Sentence

¶137    In reviewing the propriety of the death sentence, "'we consider the quality and the strength, not simply the number, of aggravating and mitigating factors.'" *State v. Roque*, 213 Ariz. 193, 230 ¶ 166, 141 P.3d 368, 405 (2006) (quoting *State v.*

54

*Greene*, 192 Ariz. 431, 443 ¶ 60, 967 P.2d 106, 118 (1998)). We give the multiple murders aggravator extraordinary weight. *Garza*, 216 Ariz. at 72 ¶ 81, 163 P.3d at 1022. In light of this significant aggravator, we must determine whether Moore's mitigating evidence is "sufficiently substantial to warrant leniency." *See* A.R.S. § 13-755(B).

¶138    Although Moore presented significant mitigating evidence based on his age and the impact of his extensive use of crack cocaine both habitually and on the night of the murders, this evidence is not sufficiently substantial to warrant leniency.

## N. Issues Preserved for Federal Review

¶139    To avoid preclusion, Moore raises twenty-six other constitutional challenges that he states have been rejected by the Supreme Court or this Court. These claims and the decisions Moore identifies as rejecting them are set forth verbatim in the Appendix.

## CONCLUSION

¶140    For the foregoing reasons, we affirm Moore's convictions for the first-degree felony murders of Delia Ramos and Guadalupe Ramos, for the first-degree premeditated murder of Sergio Mata, for the attempted first-degree murder of Debra Ford, and for first-degree burglary, and affirm Moore's death

55

sentences.  We reverse Moore's convictions for the first-degree premeditated murders of Delia Ramos and Guadalupe Ramos.


_____

                              W. Scott Bales, Justice

CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
Michael D. Ryan, Justice


_____
Ruth V. McGregor, Justice (Retired)


_____
Daniel A. Barker, Judge*


*Vice Chief Justice Andrew D. Hurwitz has recused himself from this case.  Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Daniel A. Barker, Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.

**APPENDIX**

(1)     The death penalty is *per se* cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 186-87 (1976); *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992).

(2)     Execution by lethal injection is *per se* cruel and unusual punishment.   *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

(3)     The statute unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and *no* mitigating circumstances exist.  *Walton v. Arizona*, 497 U.S. 639, 648 (1990); *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996);

(4)     The death penalty is unconstitutional because it permits jurors unfettered discretion to impose death without adequate guidelines to weigh and consider appropriate factors and fails to provide principled means to distinguish between those who deserve to die or live.  *State v. Johnson*, 212 Ariz. 425, 440 ¶ 69, 133 P.3d 735, 750 (2006).

(5)     Arizona's death statute unconstitutionally requires defendants to prove that their lives should be spared.  *State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988).

(6)     The statute unconstitutionally fails to require the cumulative consideration of multiple mitigating factors or require that the jury make specific findings as to each mitigating factor.  *State v. Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995).

(7)     Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence.  *State v. Mata*, 125 Ariz. 233, 242, 609 P.2d 48, 57 (1980).

(8)     The statute is unconstitutional because there are no statutory standards for weighing. *State v. Atwood*, 171 Ariz. 576, 645-46 n.21(4), 832 P.2d 593, 662-63 n.21(4) (1992).

(9)     Arizona's death statute insufficiently channels the sentencer's discretion in imposing the death sentence.  *State v. Greenway*, 170 Ariz. 151, 164, 823 P.2d 22, 31 (1991).

(10)    The prosecutor's discretion to seek the death penalty unconstitutionally lacks standards.  *State v. Cromwell*, 211 Ariz. at 181, 192 ¶ 58, 119 P.3d 448, 459 (2005).

(11)    Death sentences in Arizona have been applied arbitrarily and irrationally and in a discriminatory manner against impoverished males whose victims have been Caucasian.  *State v. West*, 176 Ariz. 432, 455, 862 P.2d 192, 215 (1993).

(12)    The Constitution requires a proportionality review of a defendant's death sentence.  *State v. Gulbrandson*, 184 Ariz. 46, 73, 906 P.2d 579, 606 (1995).

(13)    Subjecting Appellant to a second trial on the issue of aggravation and punishment before a new jury violates the double jeopardy clause of the Fifth Amendment.  *State v. Ring* (*Ring III*), 204 Ariz. 534, 550-51 ¶ 39, 65 P.3d 915, 931-32 (2003).

(14)    Appellant's death sentence is in violation of his rights to a jury trial, notice and due process under the Fifth, Sixth, and Fourteenth Amendments since he was not indicted for a capital crime.  *McKaney v. Foreman*, 209 Ariz. 268, 271 ¶ 13, 100 P.3d 18, 21 (2004).

(15)    Imposition of a death sentence under a statute not in effect at the time of Appellant's trial violates due process under the Fourteenth Amendment.  *State v. Ellison*, 213 Ariz. 116, 137 ¶ 85, 140 P.3d 899, 920 (2006).

(16)    The absence of notice of aggravating circumstance prior to Appellant's guilt phase trial violated the Sixth, Eighth and Fourteenth Amendments.  *State v. Anderson* (*Anderson II*), 210 Ariz. 327, 347 ¶¶ 79-80, 82, 111 P.3d 369, 389 (2005).

(17)    The reasonable doubt jury instruction at the aggravation trial lowered the state's burden of proof and deprived Appellant of his right to a jury trial and due process under the Sixth and Fourteenth Amendments.  *State v. Dann* (*Dann I*), 205 Ariz. 557, 575-76 ¶ 74, 74 P.3d 231, 249-50 (2003).

(18)    Arizona's death statute creates an unconstitutional presumption of death and places an unconstitutional burden on Appellant to prove mitigation is "sufficiently substantial to call for leniency."  *State v. Glassel*, 211 Ariz. 33, 52 ¶ 72, 116 P.3d 1193, 1212 (2005).

(19)   The failure to provide the jury with a special verdict on Appellant's proffered mitigation deprived him of his rights to not be subject to ex post facto legislation and right to meaningful appellate review. *State v. Roseberry*, 210 Ariz. 360, 373 ¶ 74 & n.12, 111 P.3d 402, 415 (2005).

(20)   The trial court improperly omitted penalty phase instructions that the jury could consider mercy or sympathy in evaluating the mitigation evidence and determining whether to sentence the defendant to death. *State v. Carreon*, 210 Ariz. 54, 70-71 ¶¶ 81-87, 107 P.3d 900, 916-17 (2005).

(21)   Arizona's *current* protocols and procedures for execution by lethal injection constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *State v. Andriano*, 215 Ariz. 497, 510 ¶¶ 61-62, 161 P.3d 540, 553 (2007).

(22)   The jury instruction that required the jury to unanimously determine that the mitigating circumstances were "sufficiently substantial to call for leniency" violated the Eighth Amendment. *State v. Ellison*, 213 Ariz. 116, 139 ¶¶ 101-102, 140 P.3d 899, 922 (2006).

(23)   The failure to instruct the jury that only murders that are "above the norm" may qualify for the death penalty violates the Sixth, Eighth and Fourteenth Amendments. *State v. Bocharski*, 218 Ariz. 476, 487-88 ¶¶ 47-50, 189 P.3d 403, 414-15 (2008).

(24)   The State's introduction of unsworn rebuttal testimony violated Appellant's rights to confrontation and cross examination under the Sixth Amendment. *State v. McGill*, 213 Ariz. 147, 158-59, 140 P. 3d 930, 941-42 (2006).

(25)   The refusal to permit voir dire of prospective jurors regarding their views on specific aggravating and mitigating circumstances violates Appellant's rights under the Sixth and Fourteenth Amendments. *State v. Johnson*, 212 Ariz. 425, 440 ¶¶ 29-35, 133 P.3d 735, 750 (2006).

(26)   Refusing to instruct the jury or permit the introduction of evidence and argument regarding residual doubt violated Appellant's rights under the Sixth, Eighth and Fourteenth Amendments and Arizona law. *State v. Harrod* (*Harrod III*), 218 Ariz. 268, 278-79 ¶¶ 37-39, 183 P.3d 519, 529-30 (2008); *State v. Garza*, 216 Ariz. 56, 70 ¶ 67, 163 P.3d 1006, 1020 (2007).